# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1810

_____

| | | |
|---|---|---|
| David Doran, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Dennis Eckold, in his official capacity | * | Western District of Missouri. |
| as President of the Board of Police | * | |
| Commissioners of Kansas City, et al., | * | |
| | * | |
| Defendants - Appellants, | * | |
| | * | |

_____

Submitted: October 20, 2004
Filed: June 6, 2005

_____

Before LOKEN, Chief Judge, HEANEY, WOLLMAN, MORRIS SHEPPARD
ARNOLD, MURPHY, BYE, RILEY, MELLOY, SMITH, COLLOTON,
GRUENDER and BENTON, Circuit Judges, en banc.

_____

LOKEN, Chief Judge.

At 10:00 p.m. on the evening of August 11, 1998, Kansas City police executed a warrant to search the home of David Doran for drugs and other contraband, using a tactic called "dynamic entry." Officer Ty Grant, serving as "ram officer," yelled "Police, search warrant," and immediately hit the front door with his ram, breaking in on the third hit. Officer Mark Sumpter as point man entered the house before its

occupants had time to answer the door. When Sumpter reached the kitchen doorway, he saw Doran running toward him pointing a handgun. Sumpter testified that he yelled, "Police, search warrant, get down," and fired when Doran did not lower his weapon. Doran was hit twice, sustaining serious injuries. He commenced this action under 42 U.S.C. § 1983, asserting Fourth Amendment damage claims against Officer Sumpter for use of excessive force; the investigating officer, Wesley Williamson, for an illegal warrant search; Officer Grant for illegal entry; Sergeant Eric Greenwell for failure to supervise Grant; and the Board of Police Commissioners for failure to train its officers regarding the Fourth Amendment restrictions on no-knock entries and for deliberate indifference to a custom and practice of no-knock entries.

At trial, Doran testified he was asleep when he heard the ramming. Thinking the noise was a break-in or a fight on the front porch, he grabbed a pistol from under his pillow, ran into the kitchen, saw laser lights and realized it was the police, and bent to set his gun on the floor when he was shot. After a four-day trial, the jury found in favor of Officer Sumpter, rejecting Doran's excessive force claim. However, the district court ruled as a matter of law that exigent circumstances did not justify the no-knock entry. As a result, the jury instructions on the illegal entry claim against Officer Grant and the failure-to-train claim against Sergeant Greenwell virtually directed a verdict in favor of Doran on those claims. The jury returned a verdict in excess of two million dollars for Doran on those claims and on his claims against the Board, finding that Doran's injuries were the direct result of the Fourth Amendment violations. The district court entered judgment on this verdict. Grant, Greenwell, and the Board appeal, arguing *inter alia* that exigent circumstances justified the no-knock entry. We agree and therefore reverse.

## I. Background.

In July 1998, Kansas City Police received an anonymous tip about criminal activity allegedly occurring at the Doran home. The tipster alleged:

- that methamphetamine was being manufactured at the house to be searched;

- that Doran was selling crack cocaine and methamphetamine at the front door throughout the day;

- that drugs were stored in dresser drawers throughout the house;

- that guns were kept in the bedroom; and

- that Doran's 26-year-old son Joseph lived in the house and had recently been arrested for possessing a sawed-off shotgun.

Narcotics Detective Wesley Williamson verified the house's location, determined that cars parked at that location were registered to the Doran family, and collected bags of trash in front of the residence. In the trash, he found fifty sandwich bags with the corners cut out, a common way for traffickers to package and distribute narcotics; methamphetamine residue in two plastic bags, three plastic sandwich bag corners, and a pill bottle; an empty box of a "Dristan" product that contains pseudoephedrine, often used in the manufacture of methamphetamine; and mail tending to confirm that the trash belonged to the Dorans. Detective Williamson recited these facts in a warrant application and obtained a warrant to search the Doran home.

The task of executing the warrant was assigned to the Police Department's Street Narcotics Unit, a specialized unit whose primary function is to execute search warrants, usually on drug houses. Sergeant Greenwell was in charge of the Unit's entry team. Before executing the warrant, Greenwell reviewed the warrant and warrant affidavit, learning about the illegal activity alleged in the anonymous tip. Sergeant Greenwell and Detective Williamson then drove by the Doran house to verify its location and to "determine any tactical concerns." Based on this information and his experience with methamphetamine labs, Sergeant Greenwell concluded that this would be a high-risk entry and instructed his team to make a dynamic entry.

On the evening of August 11, the entry team gathered at an assembly point a few blocks from the Doran home.  Because of the hazards associated with methamphetamine labs, Greenwell arranged for a fire department pumper and an ambulance to wait at the assembly point.  Members of the entry team other than Officer Grant wore respirators to reduce the risk from chemical fumes.  After Sergeant Greenwell briefed the entry team, the team proceeded to Doran's house and executed the warrant.  Doran was shot soon after Officer Sumpter entered the house.  The police completed the search after tending to Doran, finding one ounce of marijuana in the son's room but neither a methamphetamine lab nor other illegal drugs.  Doran was not charged with an offense.  This lawsuit followed.

## II.  The District Court's Rulings and the Record on Appeal.

Prior to trial, all defendants moved for summary judgment on Doran's various § 1983 claims.  As relevant here, the court granted Detective Williamson summary judgment on Doran's claim of illegal search, concluding that Williamson had sufficiently verified the anonymous tip to have "an objectively reasonable belief in the existence of probable cause for the issuance of a search warrant."  Doran dropped his remaining claim against Williamson for unlawful execution of the warrant.  Eliminated as a defendant, Williamson -- who by then had become an agent of the federal Bureau of Alcohol, Tobacco, and Firearms -- did not testify at trial.  The district court denied Officer Sumpter summary judgment on Doran's excessive force claim.  The court also denied Grant, Greenwell, and the Board summary judgment on Doran's claims relating to the no-knock manner in which the warrant was executed, concluding "there is insufficient evidence of exigent circumstances to justify dispensing with the knock and announce requirement," and there were material fact disputes over whether the entry team announced, knocked, and waited an appreciable period before entering.

Though the district court reserved a final ruling on Doran's knock-and-announce claims because of potential fact disputes, the court properly recognized that the question of exigent circumstances, like the ultimate issue of Fourth Amendment reasonableness, is an issue of law for the court. See United States v. Cooper, 168 F.3d 336, 339 (8th Cir. 1999); United States v. Mattison, 153 F.3d 406, 410 (7th Cir. 1998). Therefore, both before and during the trial, the district court excluded evidence that was relevant to the question of exigent circumstances, even if it was part of the summary judgment record on the issue, if it was either unduly prejudicial or not relevant to fact issues to be decided by the jury. For example, because the court excluded evidence tending to challenge the lawfulness of the valid search warrant, the warrant and warrant affidavit were not offered at trial. Similarly, the police "DRAGNET" report summarizing the anonymous tip was not admitted into evidence because it contained a potentially prejudicial reference to the son's alleged arrest for possession of a sawed-off shotgun.

The court made its final ruling on the exigent circumstances issue during the instructions conference held at the close of the trial evidence. Consistent with its pretrial summary judgment ruling, the district court "ruled as a matter of law that there were not exigent circumstances which permitted the waiver of the knock or wait rule, and we'll not be submitting that to the jury." In making this ruling, the court declared that it considered "all of the evidence which is admissible during the course of trial, as well as Plaintiff's Exhibit 8 [the DRAGNET tip report] . . . [and] all of the evidence that, in fact, has been presented to me." Neither party objected to the court considering evidence that was only presented during pretrial motion proceedings to decide the legal issue of whether exigent circumstances justified the no-knock entry. Indeed, given the need to withhold irrelevant or unduly prejudicial information from the jury's consideration, we agree with the district court's approach to this issue, though our task on appeal would be easier if the court had defined more precisely what evidence not in the trial record "has been presented to me." Therefore, we will

review the same record that the district court considered in making its legal determination of no exigent circumstances.[1]

### III. The Controlling Legal Standard.

In Wilson v. Arkansas, the Supreme Court held for the first time that the "common-law 'knock and announce' principle forms a part of the reasonableness inquiry under the Fourth Amendment." 514 U.S. 927, 929 (1995). The Court cautioned, however, that "[t]he Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests." Id. at 934. The Court noted examples of circumstances that may justify an unannounced entry, such as a threat of physical violence or the likely destruction of evidence, but declined to "attempt a comprehensive catalog of the relevant countervailing factors." Id. at 935-36.

The Court has applied this general principle in three subsequent cases. In Richards v. Wisconsin, the Court rejected a state supreme court's decision to adopt a blanket exception to the Fourth Amendment's knock-and-announce requirement when police execute a search warrant in a felony drug investigation. 520 U.S. 385, 388 (1997). Though acknowledging "that felony drug investigations may frequently present circumstances warranting a no-knock entry," the Court held that a case-by-case analysis of the facts of a particular entry is nonetheless required:

> In order to justify a "no-knock" entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that

---

[1]For this reason, we grant appellee's motion to take judicial notice of the search warrant and supporting affidavit, and appellants' motion to file a supplemental appendix containing Plaintiff's Exhibit 8, materials presented to and considered by the district court at the summary judgment stage but not admitted at trial.

it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.  This standard -- as opposed to a probable-cause requirement -- strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries.  This showing is not high . . . .

Id. at 394 (citations omitted).  The Court went on to hold that the no-knock entry at issue was reasonable and affirmed the judgment of the state court.

In United States v. Ramirez, the Court reversed a Ninth Circuit holding that more than a "mild exigency" must be shown to justify a no-knock entry in which property is destroyed.  523 U.S. 65, 69-70 (1998).  In Ramirez, a reliable confidential informant told police that he had seen a violent prison escapee at the Ramirez home and that Ramirez might have a stash of guns and drugs in his garage.  The Court held that the police "certainly had a 'reasonable suspicion' that knocking and announcing their presence might be dangerous to themselves or to others," so it was "clearly reasonable" to break a garage window during the no-knock entry.  Id. at 71-72.

Finally, in United States v. Banks, the Court rejected the Ninth Circuit's "four-part scheme for vetting knock-and-announce entries."  540 U.S. 31, 41 (2003).  In Banks, police executing a warrant to search for cocaine arrived at the premises to be searched with no reasonable suspicion justifying a no-knock entry and waited only fifteen or twenty seconds after the initial knock before entering.  Emphasizing again that the totality of the circumstances must be examined to determine whether exigent circumstances exist, the Court held that the risk of imminent drug disposal was an exigency that justified the forcible entry.  Id. at 40.[2]

---

[2]The Court noted in Ramirez, 523 U.S. at 73, that its decisions in Wilson and Richards "serve as guideposts in construing" the exigent circumstances exception to 18 U.S.C. § 3109.  Accord Banks, 540 U.S. at 42-43.  Thus, our contrary statement in United States v. Tavares, 223 F.3d 911, 916 n.5 (8th Cir. 2000), is overruled.

# IV. Discussion.

The district court explained the bases for its exigent circumstances ruling in an opinion denying defendants' post trial motions. The court emphasized that the police did not obtain a no-knock warrant to search the Doran home. The court also cited the following additional factors as supporting its conclusion that exigent circumstances did not justify Officer Grant's no-knock entry:

- The facts known to the police as they approached the Doran house were the same facts known when they applied for the warrant.

- The anonymous tip did not come from a reliable confidential informant, and the information was not verified or corroborated.

- The tip that drug sales were occurring at the Doran house was not corroborated by a controlled buy or surveillance.

- The trash search uncovered drug residue, but no evidence linked the trash to Doran's house.

- The police did not check the criminal history of Doran and his wife, which would have revealed no prior arrests.[3]

- The allegation that Doran's son was recently arrested for possession of a sawed-off shotgun was not verified.

---

[3]Regarding Mrs. Doran, who did not testify, the court's statement appears to be based on assertions in various memoranda filed by Doran's attorneys, who also filed a motion in limine in September 2002, some three months before trial, seeking an order excluding evidence that Mrs. Doran and her sister "had criminal records involving illegal drugs and/or prostitution." As the motion in limine was granted, the criminal history facts are not in the record on appeal. It is undisputed that the police investigators did not do criminal history checks on the Dorans and their son prior to obtaining and executing the search warrant.

- The entry team conducted no surveillance to determine if the son was home or lights were on before the nighttime entry.

- Officer Grant routinely operated the ram as he did in this case -- announce "police, search warrant," and simultaneously break in with the ram without otherwise knocking or waiting for a response.

We review the district court's exigent circumstances ruling *de novo*. Cooper, 168 F.3d at 339. The district court's analysis of the exigent circumstances issue is contrary to the Supreme Court's knock-and-announce decisions in significant respects. First, the district court erred in emphasizing the absence of no-knock authority in the search warrant. As the Court said some years ago in Dalia v. United States, 441 U.S. 238, 257 (1979):

> Nothing in the language of the Constitution or in this Court's decisions interpreting that language suggests that . . . search warrants also must include a specification of the precise manner in which they are to be executed. On the contrary, it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant -- subject of course to the general Fourth Amendment protection "against unreasonable searches and seizures."

In Richards, the Supreme Court confirmed this principle when it upheld a no-knock entry based on what the officers encountered when executing the warrant, *even though the issuing magistrate had denied a request for a no-knock warrant.* 520 U.S. at 395-96 & n.7; see Banks, 540 U.S. at 36-37. Of course, state law may require, by statute or judicial decision, that law enforcement officers who have reason to believe that exigent circumstances justify a no-knock entry include a request for that authority in the warrant application. See Davis v. State, 859 A.2d 1112, 1124-26 (Md. 2004) (collecting conflicting authorities from various States). But for Fourth Amendment

purposes, the relevant question is whether the police have reasonable suspicion of exigent circumstances at the time they execute the warrant.

Second, the district court erred in emphasizing that the facts known to the police as they approached the Doran house were the same facts known when they applied for the warrant. To be sure, many exigent circumstances cases have turned on facts that unfolded as the police approached the house to be searched, or after they initially knocked. See, e.g., Richards, 520 U.S. at 388-89. But the Fourth Amendment analysis turns on the totality of the circumstances, including facts gathered by the police before they applied for the warrant. See United States v. Scroggins, 361 F.3d 1075, 1081-82 (8th Cir. 2004). The district court's approach would *require* that the police request no-knock authority whenever the basis for a warrant application might justify a no-knock entry. Such a rule might encourage excessive use of the no-knock tactic and would be contrary to Supreme Court decisions applying the Fourth Amendment's reasonableness standard. Therefore, if the facts known prior to obtaining the warrant justify a no-knock entry, and if no contrary facts are discernable to the officers who execute the warrant, the no-knock entry is constitutionally reasonable.

Third, the district court concluded that the prior investigation by "the police" was inadequate and then attributed these inadequacies to the Street Narcotics Unit officers brought in solely to execute the warrant. This analysis of the police conduct in gross would be proper in deciding a motion to suppress evidence in a criminal prosecution of Doran arising out of the search. But § 1983 liability is personal. The question here is whether the conduct of Officer Grant and Sergeant Greenwell was constitutionally unreasonable. The answer to that question must take into account the settled principle that law enforcement officers may rely on information provided by others in the law enforcement community, so long as the reliance is reasonable. See United States v. Hensley, 469 U.S. 221, 232 (1985); Baker v. McCollan, 443 U.S. 137, 145-46 (1979); Brown v. Nutsch, 619 F.2d 758, 764-65 (8th Cir. 1980).

-10-

Fourth, the district court relied on the fact that Officer Grant "routinely operated the ram as he did in this case." But Sergeant Greenwell made the decision to make the no-knock entry after evaluating all the circumstances and assigned Officer Grant the role of ram officer. Having been briefed by Sergeant Greenwell, Grant had no constitutional duty to verify that exigent circumstances attended execution of the warrant before carrying out his assignment. Greenwell testified that he often assigned Grant the role of ram officer for high-risk entries. Thus, Grant's testimony that he employed the dynamic entry tactic whenever he was assigned to be ram officer said nothing about the prevalence or reasonableness of the tactic and did not establish a Fourth Amendment violation.

In addition to these faulty legal premises, the district court's exigent circumstances analysis gave undue weight to certain portions of the pretrial record, while ignoring others. The court focused on what it considered to be an incomplete investigation to verify the anonymous tip. But the court brushed aside the most significant corroborating evidence -- the trash search -- because "there was no evidence that the drug residue or the trash bag in which it was found was linked to the Doran residence." The evidence was that four trash bags were collected from in front of Doran's house. The bags contained drug residue and pieces of mail addressed to the Dorans. Even if Detective Williamson did not testify that the mail and the drug residue came from the same bag, it was wrong to conclude that the trash search did not corroborate critical aspects of the anonymous tip. The tip reported daily drug sales from the house, suggesting the presence of small quantities of narcotics that are readily disposable; the trash contained multiple sandwich bags with the corners cut. The tip reported on-going manufacture of methamphetamine; the trash contained six different containers with methamphetamine residue. Moreover, the court's statement that the trash "contained no evidence of any of the chemicals or apparatus used to make methamphetamine" was simply wrong. The trash contained an empty box of a product containing pseudoephedrine, a methamphetamine precursor. Of course, one box of Dristan does not confirm the presence of a meth lab. But the fact-finding

-11-

underlying the district court's exigent circumstances ruling was nonetheless clearly erroneous. The trash analysis tended to show that the anonymous tip was "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." Florida v. J.L., 529 U.S. 266, 272 (2000).

There remains the question whether exigent circumstances justified Sergeant Greenwell's decision to use the no-knock method of executing the warrant to search Doran's house. Before executing the warrant, Greenwell reviewed the warrant and warrant affidavit, interviewed the investigating officer, and drove by the Doran house. This was a reasonable level of research for the head of a team brought in to execute the warrant. Greenwell learned that the house was suspected of harboring a clandestine methamphetamine lab. That fact has justified no-knock entries in prior cases.[4] Consistent with these cases, Greenwell testified at trial:

> Q. What kind of dangers do you encounter in terms of officer safety when you enter . . . what you presume to be a meth lab?
>
> A. Well, besides the obvious danger of drugs and firearms . . . you have a lot of added problems . . . . The chemicals and the types of products that individuals use to manufacture methamphetamine are very volatile, combustible, ha[ve] caused explosion, fire, things of that nature.
>
> We carry specific types of equipment to help make our entry safer . . . and we train the [officers] to evacuate if those detectors . . . tell us . . . the environment is superseding our personal protective equipment.

---

[4]See United States v. Tucker, 313 F.3d 1259, 1265-66 (10th Cir. 2002) (nighttime execution justified by public safety exigency); United States v. Keene, 915 F.2d 1164, 1168-69 (8th Cir. 1990) (destruction of evidence), cert. denied, 498 U.S. 1102 (1991); United States v. Spinelli, 848 F.2d 26, 29-30 (2d Cir. 1988) (public safety); cf. United States v. Walsh, 299 F.3d 729, 733-34 (8th Cir.) (warrantless search authorized by public safety exigency), cert. denied, 537 U.S. 1066 (2002).

*   *   *   *   *

Q. [H]ave you ever been in a lab where somebody tried to destroy it?

A. Yes. We've been in a situation before where suspects could flee and knock over parts of the lab. . . . Sometimes they destroy the lab in an attempt to cause harm to us on the entry team and sometimes trying to destroy evidence. . . .

Q. Okay. Is there any kind of gas danger?

A. Gas, there's a phosphine gas danger. . . . [I]f they cook the product too long, [methamphetamine labs] can emit phosphine gas, which is highly deadly.

Greenwell also learned that ongoing drug street sales had been reported and that numerous weapons were kept in the house, facts that have justified no-knock entries in numerous cases.[5] Finally, he learned that Doran's son had recently been arrested for possession of a sawed-off shotgun. Though this tip later turned out to be inaccurate, reasonable suspicion that an armed and potentially dangerous resident will be present has frequently justified no-knock entries.[6]

Taken together, as we must do in assessing the totality of the circumstances, we conclude that this information, plus Williamson's trash run, established a

---

[5]See United States v. Washington, 340 F.3d 222, 227 (5th Cir.), cert. denied, 540 U.S. 1081 (2003); United States v. Gambrell, 178 F.3d 927, 928-29 (7th Cir.), cert. denied, 528 U.S. 920 (1999); Mattison, 153 F.3d at 410-11; United States v. Singer, 943 F.2d 758, 761-63 (7th Cir. 1991); State v. Baker, 103 S.W.3d 711, 717-19 (Mo. 2003) (en banc).

[6]See United States v. Nguyen, 250 F.3d 643, 645 (8th Cir. 2001); United States v. Gay, 240 F.3d 1222, 1228-29 (10th Cir.), cert. denied, 533 U.S. 939 (2001); United States v. Weeks, 160 F.3d 1210, 1213-14 (8th Cir. 1998); United States v. Murphy, 69 F.3d 237, 243 (8th Cir. 1995), cert. denied, 516 U.S. 1153 (1996).

-13-

reasonable suspicion of exigent circumstances. The burden to show a reasonable suspicion of exigent circumstances "is not high." Richards, 520 U.S. at 394. In this case, the head of a team brought in to execute the warrant learned that the house to be searched was suspected of harboring a clandestine methamphetamine lab, a stash of drugs for on-going street sales, multiple weapons, and a potentially violent resident. It was constitutionally reasonable for Sergeant Greenwell, the head of this special team, to rely on what he learned from reading the warrant documents and from interviewing the investigating officer, Detective Williamson. It was constitutionally reasonable for Officer Grant to perform his assigned duty as ram officer as he had been trained to carry out that task in cases of high-risk dynamic entries. "In making the determination of whether the Fourth Amendment has been violated by a failure to knock and announce, we must remember reasonableness is our polestar. " United States v. Mendoza, 281 F.3d 712, 717 (8th Cir.), cert. denied, 537 U.S. 1004 (2002). Accordingly, the unlawful entry claim against Grant and the unlawful entry and failure-to-train claims against Greenwell should not have been submitted to the jury.

Because the individual defendants did not violate Doran's constitutional rights, his failure-to-train and custom and practice claims against the Board of Police Commissioners should not have been submitted to the jury. See Roach v. City of Fredericktown, 882 F.2d 294, 297-98 (8th Cir. 1989). The judgment of the district court is reversed, and the case is remanded with directions to dismiss the complaint.

HEANEY, Circuit Judge, with whom MORRIS SHEPPARD ARNOLD, BYE, and SMITH, Circuit Judges, join, dissenting.

I respectfully dissent, primarily for the reasons so eloquently stated in the panel majority opinion, authored by Judge Richard S. Arnold. See Doran v. Eckold, 362 F.3d 1047 (8th Cir. 2004). In that opinion, Judge Arnold fully considered appellants' argument that the district court erred when it ruled as a matter of law that exigent circumstances did not justify the no-knock entry into the Dorans' home. Recognizing

-14-

the significance that the Supreme Court has placed upon the Fourth Amendment right to privacy in one's home, he concluded that:

> "the police should be required to make [a showing of exigency] whenever the reasonableness of a no-knock entry is challenged." The burden of proving exigency "is not high." Even so, there is some flesh to the burden, and we do not think the police sufficiently demonstrated that exigent circumstances existed to justify their "dynamic entry" into the Doran home.

Id. at 1051 (alteration in original) (citations omitted) (quoting Richards v. Wisconsin, 520 U.S. 385 (1997)). I believed Judge Arnold was right then, and continue to believe so now.

The en banc majority holds that Sergeant Eric Greenwell and Officer Ty Grant acted reasonably in concluding that exigent circumstances justified their no-knock entry into the Dorans' home. According to the record,[7] their entry was based on a

---

[7]During oral argument, a question was raised as to whether we should rely solely on the trial record or whether we should follow the district court and consider the pre-trial record as well. While a strong case can be made for the former, Judge Arnold, writing for the original panel, considered the entire record, and I agreed with that decision. I continue to do so here. In his dissent to the panel opinion, Chief Judge Loken stated that "the court erred in failing to specify the record on which its ruling was based and on relying on inferences drawn from pretrial proceedings rather than on the facts proved at trial." Doran at 1055. Apparently, Chief Judge Loken has now changed his mind. Compare ante at 5 (approving the district court's consideration of matters outside the trial record in determining if exigent circumstances exist). If we were to limit ourselves to the trial record, a no-knock search here would be clearly unreasonable: the only evidence before the jury was that Greenwell and Grant were aware that the information about the possibility of a methamphetamine lab and weapons in the Doran house came from an uncorroborated, anonymous tipster with no record of reliability.

pre-search briefing, a conversation with Detective Wesley Williamson, and their independent review of the search warrant and affidavit. This investigation made clear that the information that appellants now contend justified the no-knock entry was based on an anonymous tip from a person with no previous record of reliability. The tipster alleged that Doran was making methamphetamine, as well as dealing methamphetamine and crack cocaine all day in face-to-face transactions from the front door of his house. The tipster asserted that Doran's son, who lived at the house, had recently been arrested for possession of a sawed-off shotgun. Despite the obvious ease with which officers could have confirmed whether the allegations in the tip were true, there was an utter failure to do so. There is *no* evidence in the record that any officer checked the Doran family's criminal history to see whether they had dealt controlled substances in the past or had a history of violent acts. There is *no* evidence any officer checked the younger Doran's arrest history to see if the anonymous tip was accurate regarding the sawed-off shotgun. There is *no* evidence that any officer verified whether the younger Doran, in his mid-twenties at the time of the search, lived at the house. There is *no* evidence that officers observed any drug traffic at the Doran residence. There is *no* evidence that any officer engaged in a controlled buy at the residence. And, importantly, there is *no* evidence that any officer observed anything that would point to the existence of a methamphetamine lab. As Judge Arnold put it,

> Here, the police supported their safety concern by pointing to the following evidence: an anonymous, uncorroborated tip that the Dorans were buying and making methamphetamine; the uncorroborated statement that the younger Mr. Doran had been arrested for illegal firearm possession; the uncorroborated statement that there were guns in the house; and drug residue in a trash bag outside the home. Thus, there was almost no certainty to most of the information the police reportedly "knew." Had the police done even some investigation or surveillance they would have had a better understanding of whether the Dorans posed a security risk justifying a no-knock entry. Instead, they relied on very sketchy information, a reliance we find unreasonable, and

outweighed by the privacy interest the Fourth Amendment is meant to protect.

Doran, 362 F.3d at 1053.

Before the en banc court, appellants argued that the anonymous tip was sufficiently corroborated, directing us to four trash bags seized from outside the Dorans' home.[8] Inside these bags, according to Williamson, he found fifty sandwich bags with the corners cut, which he asserted was consistent with narcotics packaging. He also found methamphetamine residue on two plastic bags, a pill bottle, and three other pieces of plastic. Lastly, he observed a single empty box of cold medication, which contained pseudoephedrine.

As Judge Arnold noted in the panel decision, although officers may have suspected (based on an anonymous tip) that Doran was involved in the manufacture of methamphetamine, "the police did no corroborating investigation to show that the Dorans were either selling or making methamphetamine. While [appellants] point to the trash test, such evidence, at best, points to use, and certainly does not demonstrate any of the potential concerns raised by an alleged meth lab, which might, if properly developed, justify disregarding the knock-and-announce rule." Doran, 362 F.3d at 1052 n.3. Even if the contents of the trash bag may have suggested that Doran was selling methamphetamine, there was no evidence whatsoever that Doran was *currently* operating an active methamphetamine lab. Our cases have gone to great lengths to detail the type of evidence linked to the existence of an active lab. See, e.g., United States v. Lloyd, 396 F.3d 948, 954 (8th Cir. 2005) (noting that the strong

---

[8]Before the original panel, appellants primarily focused their argument on the lack of proximate cause to support the damage awards. Neither party sought to supplement the record with the pretrial material that the majority finds dispositive until this stage in the litigation. See Doran, 362 F.3d at 1050 ("The warrant and warrant affidavit were not offered into evidence and are not part of the record on appeal."). The trash bags and their contents have never been a part of this record.

smell of ether is indicative of an active methamphetamine lab); United States v. Dishman, 377 F.3d 809, 810 (8th Cir. 2004) (identifying cans of Coleman fuel and anhydrous ammonia as precursor products to the manufacture of methamphetamine); Kleinholz v. United States, 339 F.3d 674, 677 (8th Cir. 2003) (associating the intense smell of ether with an active methamphetamine lab); United States v. Francis, 327 F.3d 729, 732 n.7 (8th Cir. 2003) (noting that items seized in clean up of methamphetamine lab "included coffee filters stained with red phosphorous, juice jars with coffee filters, a 1,000 ml Pyrex flask, a bottle of hydrochloric acid, another 1,000 ml flask half full with a liquid, a bottle of Vitablend, a triple-neck Pyrex beaker containing actively-reacting liquids, a large plastic baggie that contained coffee filters with red stains, miscellaneous tubing and hoses, a bottle of PH paper, empty Mason jars, muriatic acid, laboratory funnels, multiple 500 ml Pyrex flasks, miscellaneous funnels, Pyrex measuring material, acetone, and other chemical containers"); Walsh, 299 F.3d at 734 ("Here, the strong smell of ether and the equipment and residue found in the carport suggested ongoing [methamphetamine] manufacture in the shed."). In this case, there was no suggestion that anything in the trash pointed to an active methamphetamine lab in the Dorans' home, that odors that typically emanate from active labs were evident, or that officers observed any of the attributes of a methamphetamine lab during their investigation.

In footnote 4 of its opinion, the majority cites a number of cases for the proposition that the suspicion of "harboring a clandestine methamphetamine lab . . . has justified no-knock entries." Ante at 12. A careful review of these cases makes clear that each of them involved the *reasonable* suspicion of an active methamphetamine lab. For instance, in United States v. Tucker, 313 F.3d 1259 (10th Cir. 2002), whether the officers properly entered without first knocking was not even an issue on appeal; the case involved a night-time search. Even so, the night-time search was permitted because officers had a reasonable suspicion, based on information including direct observations of the defendant's recent purchases of methamphetamine precursors, that the defendant might be starting a

methamphetamine cook. Id. at 1261, 1265-66. In United States v. Spinelli, 848 F.3d 26, 29-30 (2d Cir. 1988), the defendant had a prior conviction for methamphetamine production, possessed a handgun during a prior arrest, and had a reputation for violence. Furthermore, "agents had observed activity . . . during the previous few days that indicated that the manufacture of methamphetamine was ongoing." Id. at 29. The two cases cited from our circuit, United States v. Keene, 915 F.2d 1164 (8th Cir. 1990), and United States v. Walsh, 299 F.3d 729 (8th Cir. 2002), are equally inapplicable. Keene involved direct observations of an active methamphetamine lab in the defendant's basement. Keene, 915 F.3d at 1166-67. In Walsh, the information gleaned immediately prior to the execution of the warrant, such as "the strong smell of ether and the equipment and residue found in the carport area suggested ongoing [methamphetamine] manufacture in the shed." Walsh, 299 F.3d at 734. These cases involved a reasonable suspicion of an active methamphetamine lab based on reliable information. The same cannot be said for Doran's case.

I also take issue with the majority's view that Greenwell and Grant cannot be liable for Doran's severe injuries, because their decision to effect a "dynamic entry" was based on information provided by Williamson. The majority cites United States v. Hensley, 469 U.S. 221 (1985), in support of this proposition, yet ignores Hensley's caution that the officers' reliance on information provided by others must be *reasonable*, id. at 232-33. In Hensley, an officer from one jurisdiction performed an investigatory stop on the defendant based on a "wanted flyer" that had been issued by another jurisdiction. The question for review was "whether police officers could stop and briefly detain a person who is the subject of a 'wanted flyer' while they attempt to find out whether an arrest warrant has been issued." Id. at 223. The Court determined that the reasonableness of such police conduct depends on the extent of the officers' knowledge: "It is the objective reading of the flyer or bulletin that

-19-

determines whether other police officers can defensibly act in reliance on it." Id. at 232-33.[9]

Applying Hensley, it is obvious that Greenwell's and Grant's reliance on the information provided to them by Williamson prior to the search could not possibly insulate them from liability. The analogue for Hensley's "wanted flyer" in this case is the search warrant and affidavit, and a briefing by Williamson. From this information, Greenwell and Grant knew the "facts" were largely uncorroborated and unreliable allegations from an anonymous informant, and did not answer the question of whether genuine exigencies permitted Greenwell and Grant to do away with the knock-and-announce rule. Moreover, Greenwell and Grant knew they did not have a magistrate's permission to perform a no-knock search. No objective officer could have believed that, based on this information, a no-knock search was permissible.

The Supreme Court has consistently emphasized the importance of an officer's duty to knock and announce his presence before forcing entry into a person's home. In Wilson v. Arkansas, 514 U.S. 927, 929 (1995), the Court held that the "common-law 'knock and announce' principle forms a part of the reasonableness inquiry under

---

[9]Baker v. McCollan, 443 U.S. 137 (1979), is also cited by the majority for the proposition that Greenwell and Grant did not need to perform further investigation. This case is wholly inapposite. Baker involved a person who was wrongly arrested on an outstanding warrant due to mistaken identity, and the Court held that there was no due process violation arising from officers' arrest and three-day detention of the plaintiff. There was no question, though, that the warrant itself was valid and appeared to confer the power to arrest the wrongly detained individual, and that the plaintiff matched the name and description of the sought-after fugitive (who was his brother). In contrast, Greenwell and Grant should have known from reviewing the warrant and supporting documents that there was not sufficient information to support a no-knock entry without further corroborative investigation.

the Fourth Amendment."[10]  It noted that an unannounced entry may be permissible if the government could show that there was a threat of violence or a risk that evidence would likely be destroyed if officers complied with the knock-and-announce rule.  Id. at 935-36.  Neither showing was made here.

The knock-and-announce principles were revisited in Richards v. Wisconsin, 520 U.S. 385 (1997), where the Court was faced with Wisconsin's rule that officers are never required to knock and announce in felony drug investigations.[11]  Justice Stevens, writing for a unanimous court, recognized that felony drug investigations frequently involve the threat of violence and the possibility that evidence may be destroyed.  Id. at 392 & n.2.  Nonetheless, he concluded that blanket exceptions to the

———————————

[10]It is because of Wilson that I find unpersuasive the majority's citation to Dalia v. United States, 441 U.S. 238 (1979), in support of its contention that the execution of a warrant is best left to an officer's judgment.  When Dalia was decided, Wilson had not explicitly included the knock-and-announce principle as part of the Fourth Amendment reasonableness inquiry.  Thus, Dalia stands for nothing more than the rule that officers have discretion to conduct searches within the bounds of the Constitution, which did not happen in this case.

[11]The majority notes that the Richards Court upheld the no-knock search, even though the officers had asked for and been denied a no-knock warrant.  While it is not clear why the magistrate initially denied the no-knock warrant application, it is clear from Richards why the Court approved the no-knock execution:  when officers were executing the warrant, the suspected drug dealer slammed his motel room door in the officers' faces.  See Richards, 520 U.S. at 396 (stating that "the petitioner's apparent recognition of the officers combined with the easily disposable nature of the drugs [] justified the officers' ultimate decision to enter without first announcing their presence and authority").  I have found no authority for the majority's proposition that an officer can conduct a no-knock search without a magistrate's approval based on information acquired prior to seeking the warrant.  Despite the majority's insinuation to the contrary, Richards certainly does not stand for, or even support, this theory.

traditional knock-and-announce requirement could not be tolerated under the Fourth Amendment:

> First, the exception contains considerable overgeneralization. For example, while drug investigation frequently does pose special risks to officer safety and the preservation of evidence, not every drug investigation will pose these risks to a substantial degree. For example, a search could be conducted at a time when the only individuals present in a residence have no connection with the drug activity and thus will be unlikely to threaten officers or destroy evidence. Or the police could know that the drugs being searched for were of a type or in a location that made them impossible to destroy quickly. In those situations, the asserted governmental interests in preserving evidence and maintaining safety may not outweigh the individual privacy interests intruded upon by a no-knock entry. Wisconsin's blanket rule impermissibly insulates these cases from judicial review.

> A second difficulty with permitting a criminal-category exception to the knock-and-announce requirement is that the reasons for creating an exception in one category can, relatively easily, be applied to others. Armed bank robbers, for example, are, by definition, likely to have weapons, and the fruits of their crime may be destroyed without too much difficulty. If a *per se* exception were allowed for each category of criminal investigation that included a considerable–albeit hypothetical–risk of danger to officers or destruction of evidence, the knock-and-announce element of the Fourth Amendment's reasonableness requirement would be meaningless.

> Thus, the fact that felony drug investigations may frequently present circumstances warranting a no-knock entry cannot remove from the neutral scrutiny of a reviewing court the reasonableness of the police decision not to knock and announce in a particular case. Instead, in each case, it is the duty of the court confronted with the question to determine whether the facts and circumstances of the particular entry justified dispensing with the knock-and-announce requirement.

Id. at 393-94 (footnote omitted).[12]

The majority clearly ignores the admonition in Richards to determine whether the facts and circumstances *in this case* justified excused compliance with the knock-and-announce rule.  Id.  It rather takes the position that a "dynamic entry" was permitted because of an anonymous tipster's allegations that methamphetamine manufacture and sales were occurring at the Doran residence, and that the Dorans' son had recently been arrested for possessing a prohibited weapon.  In doing so, the majority has disregarded Richards, and, in effect, has created a "blanket exception" to the knock-and-announce requirement.  Judge Arnold put it well in his opinion for the original panel:

> Officer Grant testified that exigent circumstances existed because (a) there was a "safety factor" involved in raiding drug houses, (b) there were violent, armed people in drug houses, and (c) he assumed the existence of lethal fumes from the chemicals used to produce methamphetamine. While not directly stated, the implication behind his testimony is that the police feared for their safety because the Doran house was presumed to be a methamphetamine lab.  This reasoning, if allowed, would lead to a *per se* exception to the knock-and-announce rule for methamphetamine labs.  The Supreme Court has warned against such a result.  The Fourth Amendment preserves the right of privacy one has in one's home.  To overcome that privacy exception, the police

---

[12]Since Richards, the Supreme Court has reaffirmed the knock-and-announce rule in United States v. Ramirez, 523 U.S 65 (1998), and United States v. Banks, 540 U.S. 31 (2003).  Ramirez involved a no-knock search that was conducted, pursuant to a no-knock search warrant, after police received information about an escapee from a confidential, reliable informant.  Ramirez, 523 U.S. at 68-69.  Banks did not involve a no-knock search at all; the issue was whether a fifteen-to-twenty-second pause between an announcement and forced entry was permitted during a daytime warrant execution in a drug investigation.  Banks, 540 U.S. at 33-34.  Neither case speaks to an officer's (as opposed to a magistrate's) decision to conduct a nighttime, no-knock execution of a warrant based on anonymous and largely uncorroborated information.

interest should be specific to the individual and the place, not generalized to a class of crime.

Doran, 362 F.3d at 1052 (citation and quotation omitted).

In addition to being inconsistent with the Supreme Court's Fourth Amendment jurisprudence, the case before us is indistinguishable from United States v. Lucht, 18 F.3d 541 (8th Cir. 1994). Lucht involved a large-scale drug conspiracy. One defendant, Kress, appealed the denial of his motion to suppress evidence seized during a search of his home. He argued that the executing officers acted improperly by not first knocking and announcing their presence before forcing entry. Prior to the search, Robert Frock, who was in charge of executing the search, was advised that the search was for a large amount of methamphetamine, and that "there was a likelihood weapons would be present." Id. at 550. Frock was aware that Kress was a member of a motorcycle gang, and suspected "that Kress had anti-police sentiments." Id. Frock supposed that the search would be dangerous because his team, the Emergency Response Unit (ERU), was being used. Id. Based on these facts, the government argued its agents were confronted with an exigency that relieved them of the requirement to knock and announce their presence before forcing their way into Kress's home. Our court disagreed:

> We appreciate the fact that Frock assumed this was a high risk situation because ERU was employed. However, a decision to force entry cannot rest on an assumption. It requires consideration of the particular facts and circumstances surrounding the execution of the warrant. Here, ERU was not in a dangerous tactical situation. They did not hear or see anything to indicate they were in danger or that evidence was being destroyed. Frock knew that there was a likelihood that there were weapons in the house, but he had no information indicating that Kress was considered dangerous or violent or might be inclined to use the weapons against them. See United States v. Marts, 986 F.2d 1216, 1217-18 (8th Cir. 1993) (reasonable belief firearms may have been within residence, standing alone, clearly insufficient for exigent

-24-

circumstances).  Frock's belief that Kress had a propensity for anti-police sentiments was not based on any particularized knowledge.  In fact, Kress's criminal record consisted of a nine-year-old misdemeanor drug possession conviction and a thirteen-year-old charge for carrying a concealed weapon for which prosecution was declined.  Frock also knew that the search was for a large amount of methamphetamine, but he testified that this did not alter how he entered the house.

Id. at 551 (footnote omitted).

In Lucht, Kress was alleged to be dealing methamphetamine and carrying weapons, yet this did not justify ignoring the knock-and-announce rule.  Similarly, Doran was anonymously alleged to be dealing drugs, having weapons, and his son supposedly had recently been arrested for possessing a sawed off shotgun.  Of course, the en banc majority can overrule Lucht, but it does not so much as mention the case.

There is additional support for my view that the no-knock search was unreasonable.  First, when officers went to the magistrate to obtain the warrant, they did not seek permission to perform a no-knock entry.  I have found no authority for the proposition that an officer, armed with all the knowledge that he believes supports a no-knock entry prior to asking for a warrant, may nonetheless usurp the role of the magistrate and decide on his own whether to knock and announce his presence.  As a panel of our court has recently noted, "when the officers know, before searching, of circumstances that they believe justify a no-knock entry, it seems more consistent with the Fourth Amendment to ask a neutral judge for approval before intruding upon a citizen's privacy." United States v. Scroggins, 361 F.3d 1075, 1082 (8th Cir. 2004).  Indeed, "[t]he showing the police must make to obtain a no-knock warrant is the same showing they must make to justify their own decision to dispense with the knock-and-announce requirement. *Only the timing differs.*" Id. (emphasis added).  After today, not even the timing differs:  Officers may seek a warrant but withhold a request for

no-knock authorization, even when they later justify their no-knock intrusion entirely on information they knew before they sought the warrant.

As the district court noted, nothing changed from the time the officers sought the warrant and the time they executed the search. The police received the anonymous tip in this case on July 20, 1998. Without explanation, Williamson delayed his request for a warrant until August 6, 1998. Even after officers received the warrant, they did not perform the search until August 11, 1998. Certainly, there is questionable logic in appellants' assertion that they were concerned about an active methamphetamine lab and all of its attendant dangers when they took nearly a month to search for the lab.

In conclusion, I find no reasonableness in the "dynamic entry" into the Dorans' home in the dead of night. The executing officers knew that the purported exigency was based on stale, unvarying, and largely uncorroborated information, which turned out to be entirely untrue. Their suspicions were based upon inference built upon inference, with no true factual basis. Moreover, there was no information specific to the Doran home that permitted a no-knock entry. The officers' view that cases involving drugs and weapons should be excepted from the knock-and-announce principle finds no support in the Constitution. Nonetheless, it has now been adopted by the majority in this case. This stands at odds with the Supreme Court's knock-and-announce jurisprudence, and leaves an innocent man with no redress for clearly unreasonable and unconstitutional governmental conduct. I cannot accept the fairness of such a result. I would respect the jury's verdict and affirm the district court.

_____