# United States Court of Appeals

## For the Eighth Circuit

_____

No. 23-2834

_____

Susan Davenport; Chris Davenport; Lloyd St. Clair; Floyd St. Clair

*Plaintiffs - Appellants*

v.

City of Little Rock, A Municipality; Kenton Buckner, Individually and in his
Official Capacity as Police Chief; Amber Kalmer, Individually; Russ Littleton,
Individually; Jason Follett, Individually; Timothy Calhoun, Individually; Matthew
Thomas, Individually; Vicky Keathley, Individually; Kenneth Temple,
Individually

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Central

_____

Submitted: January 15, 2025
Filed: July 7, 2025

_____

Before LOKEN, ARNOLD, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

On September 1, 2016, law enforcement officers conducted narcotics raids[1] at a home and shop located on the same piece of property in Pulaski County, Arkansas. Officers found contraband in both locations, and, during the raid of the shop, an officer shot and injured a man named Lloyd St. Clair. Lloyd[2] and other occupants of the home and shop brought a lawsuit under § 1983, alleging that the officers and the City of Little Rock violated their Fourth Amendment rights. The district court[3] granted summary judgment to defendants, plaintiffs appeal, and we affirm.

I.

Officers investigating drug activity came to suspect that contraband would be found at a home and shop located on King Road. After obtaining no-knock search warrants[4] from a state judge, officers executed them on the morning of September 1. The officers divided into two teams to search the home and shop simultaneously. At the time of the searches, Susan and Chris Davenport were inside the home, and Floyd and Lloyd St. Clair were inside the shop.

At the home, officers deployed distraction devices upon entry. After a search, they recovered a small amount of marijuana from the home.

---

[1]According to the Little Rock Police Department's Divisional Operating Procedures, a "narcotics raid" is "[t]he execution of a search warrant utilizing forcible entry with the goal of seizing narcotic contraband and its purveyor(s)."

[2]We refer to appellants collectively as plaintiffs, but individually by their first names to avoid confusion.

[3]The Honorable James M. Moody, Jr., United States District Judge for the Eastern District of Arkansas.

[4]Plaintiffs dispute whether there were two warrants at the time of the searches. As explained in detail below, we conclude there is no genuine dispute as to whether both warrants existed prior to the searches.

At the shop, Officer Matthew Thomas was the first to enter and, after scanning the room, he deployed a distraction device. Thomas then saw Floyd sitting at a desk and ordered him to put his hands up; Floyd complied. Thomas moved further into the shop and saw a man holding a shotgun in a separate room. Believing that the man—Lloyd—was pointing the gun at him, Thomas shot Lloyd several times. A medic treated Lloyd's injuries while the officers completed the search, and Lloyd was later taken to a hospital. The officers found drugs and drug paraphernalia at the shop.[5]

State charges were filed against Lloyd, Floyd, and Chris based on the recovered evidence. Lloyd and Floyd pleaded guilty to various charges,[6] and both were sentenced to probation and a fine.

Lloyd, Floyd, Chris, and Susan later brought this § 1983 suit. The complaint alleged a Fourth Amendment unlawful search claim against Little Rock police department (LRPD) narcotics officers Amber Kalmer and Russ Littleton; an unlawful entry claim against LRPD SWAT officers Jason Follett, Timothy Calhoun, and Matthew Thomas, as well as Kalmer and Littleton (collectively, officer defendants); an excessive force claim against Thomas; and a Monell claim against the City of Little Rock, Arkansas and then-Police Chief of the LRPD Kenton

---

[5]Relevant here, the officers recovered: "two baggies w/ crystalline substance," a "glass pipe with white residue," "two green pills in [a] container," a "digital scale," a "baggie w/ green leafy substance," a "black digital scale," "two marijuana seeds in [a] container," an "unknown caliber rifle," a "Stevens 20 gage," "misc. rounds," and an "unk[nown] shot gun."

[6]Lloyd pleaded guilty to two counts of possession of drug paraphernalia, three counts of possession of a controlled substance with intent to deliver, one count of possession of a controlled substance, and aggravated assault. Floyd pleaded guilty to possession of drug paraphernalia. As for Chris, he was charged with possession of a controlled substance, but the charge was later dismissed.

Buckner, in his official capacity.[7] The district court granted summary judgment to defendants.

Plaintiffs appeal.

## II.

"We review a district court's grant of summary judgment de novo. We construe the facts in the light most favorable to the nonmoving party . . . and give [them] the 'benefit of all reasonable inferences in the record.'" Hodge ex rel. Farrow v. Walgreen Co., 37 F.4th 461, 464 (8th Cir. 2022) (first alteration in original) (quoting Shanner v. United States, 998 F.3d 822, 824 (8th Cir. 2021)). "We affirm if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" LADS Network Sols., Inc. v. Agilis Sys., LLC, 138 F.4th 1059, 1061 (8th Cir. 2025) (quoting Fed. R. Civ. P. 56(a)). To create a genuine dispute of material fact, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)).

---

[7]The complaint alleged additional claims, but the above-listed claims are the only ones plaintiffs meaningfully address on appeal. Thus, all others are waived. See Milligan v. City of Red Oak, 230 F.3d 355, 360 (8th Cir. 2000) (finding waiver where an issue was "mention[ed] in passing" with no "argument or legal authority" in support); United States v. Aldridge, 561 F.3d 759, 765 (8th Cir. 2009) ("Because the brief does not support this assertion with any argument, this court deems the issue abandoned.").

A.

We begin with plaintiffs' Fourth Amendment claims for unlawful search and entry against the officer defendants. On appeal, plaintiffs assert that they created two disputes of material fact that preclude summary judgment.

First, on the unlawful search claim, plaintiffs argue that a genuine dispute remains as to whether Kalmer and Littleton had two separate warrants, one for each location, at the time of the searches.[8] The record includes two search warrants and accompanying affidavits-in-support: one for the home and one for the shop. Both warrants are signed and dated by the same state judge—the warrant for the home on August 17, the warrant for the shop on August 31. And the warrants, affidavits, and inventory lists all contain a file stamp of September 2, 2016, the day after the raids. The chief clerk of the Little Rock District Court, criminal division, attested that she recognized the state judge's signature on each of the warrants, and that the "two separate original warrants . . . ha[d] been continuously maintained in the [state] District Court records."[9]

Plaintiffs rely heavily on the fact that the warrant and affidavit for the shop bear additional, circular District Court seals, also dated September 2, 2016, but the

_____

[8]Plaintiffs appear to admit to the validity of the warrant to search the shop but argue that no valid warrant existed for the home.

[9]Plaintiffs argue that the chief clerk's affidavit is unreliable because it lacked foundation and was not supported by personal knowledge. See Brooks v. Tri-Systems, Inc., 425 F.3d 1109, 1111 (8th Cir. 2005) (explaining "that affidavits may be considered in ruling on a motion for summary judgment" but they must "be made on personal knowledge . . . and . . . show affirmatively that the affiant is competent to testify to the matters stated therein" (quoting Fed. R. Civ. P. 56(e))). The clerk attested that she worked for the state judge who authorized the warrants for ten years and thus, was easily able to recognize the judge's signature. And as the criminal division's records custodian, the clerk was competent to testify about the state court's recordkeeping. The affidavit is proper summary judgment evidence.

warrant and affidavit for the home do not—a discrepancy the chief clerk could not explain. But plaintiffs did not introduce evidence explaining why the presence or absence of the seal was relevant to whether the warrant for the home issued, particularly in light of the filed, stamped copy in the court's records.

Plaintiffs also highlight statements from officers about executing "a" warrant and assert that this supports an inference that only the warrant to search the shop—not the warrant to search the home—existed at the time of the searches. But several officers also gave statements, including in reports prepared on the day the warrants were executed, that expressly referred to two warrants. And the officers were divided into two teams who conducted the searches of the locations simultaneously. Each team executed "a" warrant. Each warrant was also accompanied by its own supporting affidavit from Kalmer, describing separate, controlled drug buys outside the home and shop on August 17 and August 29, respectively. We agree with the district court that statements about "a" warrant, under these circumstances, "do[] not call into question the existence of two warrants."

As we understand plaintiffs' theory, they assert the warrant to search the home was fabricated after the fact. But they offer no evidence of fabrication, and the theory otherwise lacks support in the record. See Gibson v. Am. Greetings Corp., 670 F.3d 844, 853 (8th Cir. 2012) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to survive summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986))). On this record, plaintiffs have failed to raise a genuine dispute of material fact as to whether the warrant for the home existed at the time of the raids.

Second, on the unlawful entry claim against the officer defendants, plaintiffs argue there is a genuine issue of material fact as to whether there was reasonable suspicion to justify no-knock entries at the two locations. Kalmer testified in deposition that she sought no-knock warrants because she saw Facebook videos of

Amy St. Clair[10] shooting firearms—a handgun and either an automatic or semiautomatic firearm—on King Road. Plaintiffs do not dispute that, if Kalmer did see the videos in advance of the raids, there was reasonable suspicion to expect weapons at the home or shop and therefore to execute the warrants as no-knock entries. See Richards v. Wisconsin, 520 U.S. 385, 394 (1997) (establishing that "[i]n order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime" (emphasis added)).[11] Thus, the only question plaintiffs present is if there is a genuine dispute of fact about whether Kalmer saw the videos in advance.

Plaintiffs first point to Kalmer's deposition testimony where, in their view, she either concedes that she did *not* see the videos prior to the day of the raids,[12] or at a minimum, contradicted herself. At her deposition, Kalmer testified as follows:

---

[10]Amy St. Clair is not a party to this action, but she is a family member of Susan, Lloyd, and Floyd.

[11]Plaintiffs do not challenge the state judge's decision to authorize no-knock entries for the home and shop. Therefore, whether the generalized information provided in the affidavits was sufficient to justify the issuance of no-knock warrants is not before us. See Richards, 520 U.S. at 394–95 (rejecting a state's "blanket exception to the knock-and-announce requirement" for search warrants in felony drug investigations and clarifying the distinction between the probable cause requirement for issuance of a warrant and the reasonable suspicion requirement "to justify a 'no-knock' entry").

[12]It is not entirely clear whether plaintiffs argue only that Kalmer did not see the videos prior to seeking the warrants, or that she never saw the videos at all. We note that, "for Fourth Amendment purposes, the relevant question is whether the police have reasonable suspicion of exigent circumstances at the time they execute the warrant." Doran v. Eckold, 409 F.3d 958, 964 (8th Cir. 2005). Thus, even if Kalmer had not seen the videos before seeking the warrants, no-knock entries would have been constitutionally permissible so long as the officers had reasonable suspicion of exigent circumstances at the time the warrants were executed. See id.

Q: All right. So did you have any reason to believe that there'd be firearms at either of the locations on King . . . Road?
A: Yes. Yes, sir.
Q: . . . What's the basis for that?
A: Amy St. Clair had posted several videos of her shooting weapons at what appeared to be up there at . . . King Road.
Q: Right. But you hadn't seen those prior to the no-knock raid.
A: I never had interaction with Amy, so no, sir.
. . .
Q: What proof do you have that you can tell me or show me right now that you were aware of any of those videos at the time that you drafted these affidavits?
A: I'm telling you that I viewed them and knew of the videos.
. . .
Q: Okay. So what you're saying is, is that . . . you saw the video of Amy St. Clair firing that gun before you drafted these affidavits?
A: Yes, sir.
Q: Why didn't you put that information in the affidavits?
A: I just didn't put it in the affidavit.

When first asked if she had "seen those prior to the no-knock raid," Kalmer said, "I never had interaction with Amy, so no, sir." But when asked to clarify whether she was "aware of any of those videos at the time that [she] drafted the[] affidavits," Kalmer responded, "I'm telling you that I viewed them and knew of the videos."

Plaintiffs also argue that Kalmer made "pre-raid statements" that she was unaware of any potential threat that would justify no-knock entries. In support, they rely on forms from a separate unit of the LRPD, the SWAT team, called Warrant Service Information Sheets. These forms are generic, pre-raid worksheets that ask stock questions about the property to be searched and, as relevant here, whether "the suspect [is] known or believed to possess a weapon." Two of these forms were filled out for the King Road raids—one for the home and one for the shop—and both show that the weapon-possession question was answered as "unknown." Plaintiffs attribute these answers to Kalmer, and contend they are inconsistent with her assertion that she *did* believe guns may be present. But Kalmer was not a member of the SWAT team, and there is no indication that she filled out the worksheets or

otherwise adopted or approved them. Instead, Kalmer attested that she participated in the pre-raid briefing, where she told the SWAT unit about the videos she saw on Facebook. Three SWAT team officers—Calhoun, Follett, and Thomas—submitted affidavits stating that Kalmer told them about the videos at the pre-raid briefing. And Calhoun and Follett specifically attested that the forms indicated it was "unknown" if weapons would be present only because the officers "could not be absolutely certain."

Taken together, plaintiffs' characterization of Kalmer's deposition testimony and the SWAT unit forms do not call into question Kalmer's assertions—supported by the averments of Calhoun, Follett, and Thomas—that she saw the videos before the raids. See Hodge ex rel. Farrow, 37 F.4th at 464 ("The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." (quoting Anderson, 477 U.S. at 256)). We affirm the grant of summary judgment to the officer defendants on these claims.

B.

Next, we turn to Lloyd's excessive force claim against Thomas. "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." Z.J. ex rel. Jones v. Kan. City Bd. of Police Comm'rs, 931 F.3d 672, 681 (8th Cir. 2019) (quoting Brown v. City of Golden Valley, 574 F.3d 491, 496 (8th Cir. 2009)). "Whether the use of deadly force is reasonable turns on 'the totality of the circumstances, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officer or others, and [3] whether the suspect is actively fleeing or resisting arrest.'" Wallace v. City of Alexander, 843 F.3d 763, 768 (8th Cir. 2016) (quoting Loch v. City of Litchfield, 689 F.3d 961, 965 (8th Cir. 2012)).

We have held that deadly force is reasonable where an officer believes a suspect is pointing a gun at him. See Partlow v. Stadler, 774 F.3d 497, 502 (8th Cir. 2014) (holding use of deadly force reasonable when suspect "move[d] the shotgun in such a way that the officers believed that [he] was aiming the barrel of the shotgun at them"). Here, the parties dispute whether Thomas saw Lloyd doing so before shooting at him through a wall. But there is no genuine dispute of fact because Thomas stated that Lloyd pointed the gun at him, and Lloyd admitted that he did.[13] As to the second time Thomas shot at Lloyd, Thomas claimed it looked like Lloyd was reloading his gun. Lloyd does not offer evidence contradicting Thomas's assertion, let alone showing how Thomas's belief that Lloyd continued to pose an imminent threat was unreasonable. See Partlow, 774 F.3d at 503 ("It is possible that the officers were mistaken in perceiving that Partlow was taking aim at them. Any such mistake, however, was objectively reasonable in light of the circumstances known to the officers."). Under our precedent, Thomas's use of deadly force was not unconstitutional.

C.

Finally, turning to the municipal liability claim against the City and Buckner in his official capacity, the district court granted summary judgment to defendants after finding that there was no underlying constitutional violation. We agree. "[A]bsent a constitutional violation by a city employee, there can be no § 1983 or Monell liability for the City." Whitney v. City of St. Louis, 887 F.3d 857, 861 (8th Cir. 2018); see also Jones v. Faulkner County, 131 F.4th 869, 876 (8th Cir. 2025).

---

[13]Lloyd admitted to pointing the gun at Thomas, under oath, at his combined plea and sentencing hearing. His later statements to the contrary do not create a genuine dispute of material fact. See Prosser v. Ross, 70 F.3d 1005, 1008 (8th Cir. 1995) ("We have held that a party cannot avoid summary judgment by contradicting his own earlier testimony." (collecting cases)).

Thus, we need not reach plaintiffs' arguments about evidentiary errors allegedly committed by the district court regarding this claim.[14]

## III.

The judgment of the district court is affirmed.

_____

---

[14]For the same reason, we need not reach plaintiffs' additional argument that Kalmer and Littleton violated LRPD policies in conducting the controlled buys.