# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1898

_____

United States of America,       *
                                     *

       Plaintiff - Appellee,     *

                                   *   Appeal from the United States

     v.                          *   District Court for the

                                   *   Northern District of Iowa.

Chad A. Lloyd,            *

                                   *

       Defendant - Appellant.   *

_____

Submitted: October 19, 2004
Filed: February 2, 2005

_____

Before MURPHY, HEANEY, and BEAM, Circuit Judges.

_____

MURPHY, Circuit Judge.

Chad A. Lloyd pled guilty to possession of methamphetamine with intent to distribute after a previous felony drug conviction. The district court[1] denied his motion to suppress evidence from his residence, and his plea agreement preserved his right to appeal that ruling. Lloyd was sentenced to 151 months and now appeals, arguing that the district court erred by denying his motion to suppress. We affirm.

_____

[1]The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa.

Lloyd operated an automobile repair shop in one half of a building leased from Larry and Bethel Sylvester, and he also lived there. The Sylvesters became concerned about some abandoned vehicles Lloyd kept on the property, and on March 20, 2002 Mrs. Sylvester called the Linn County Sheriff's office to request assistance in contacting him. Sergeant Gene Parks and Deputy Nick Hamilton responded and went to Lloyd's residence around 6:30 p.m. with Mrs. Sylvester and her granddaughter Teisha. At that time the deputies knew there was a valid outstanding arrest warrant for Lloyd on a misdemeanor charge.

When they arrived at Lloyd's residence, Parks and Hamilton went to the back of the building because they knew he had a security camera in the front. The Sylvesters went to the front door on Lloyd's side of the building and knocked, but there was no answer. Meanwhile at the back of the residence, Sergeant Parks heard noises inside, including the sound of a fan. He also saw that the windows were blacked out, and he smelled a strong odor of ether. When the deputies went around to the front of the building, Parks noticed two ether cans lying on the ground next to an abandoned vehicle. Both cans had been punched open.

The deputies followed the two women as they went over to the other side of the building where Mrs. Sylvester's son Mark operated a garage. There they encountered Terry Hines, a friend of Mark's who had recently moved into the building. The deputies knew Hines from prior arrests for drug and domestic abuse offenses, and he told them that he did not think Lloyd was at home although he had been at the residence earlier.

Sergeant Parks continued to hear the fan and other noises in Lloyd's place, and the Sylvesters decided to go inside to look for him. They entered Lloyd's side of the building through an unlocked inside door which separated the two parts. Teisha knocked on the door, and Mrs. Sylvester called Lloyd's name as they entered into a kitchenette part of a large garage area. It was dark inside, and Teisha asked the

deputies to come in to help them find a light switch. As soon as the deputies entered, they noticed a very strong odor of ether. They shone their flashlights around the room, and Mrs. Sylvester walked farther inside. The deputies followed with their flashlights, and the smell of ether got stronger as they approached the bedroom in the rear of the residence. When they shone their flashlights into that room, they saw a bottle with hoses near a fan that was blowing fumes out of a makeshift air funnel. They recognized it as a methamphetamine lab and ordered everyone out of the building for safety reasons.

They also discovered a dog that apparently had caused the noises heard from outside; the dog appeared to them to be lethargic and intoxicated from the ether fumes. The deputies removed the dog and secured the building from the outside, then called Major Yount of the Drug Enforcement Administration Task Force. When Yount arrived at the scene at 8:21 p.m., he told Parks to go get a search warrant.

When Sergeant Parks returned to his office to draft a warrant application, he experienced one problem after another. He was unable to access his regular search warrant forms because his recently moved computer had locked up. After no one returned his call for help to access the computer, he located some other forms and began to type the warrant application. Parks was able to complete his affidavit, which described the call from Mrs. Sylvester, the entry into the building where Lloyd lived, and the discovery of the methamphetamine lab. Then the typewriter broke down before Parks could type the warrant application or the warrant, and he filled them out by hand.

On the application form he wrote out by hand a list of items to be seized from Lloyd's residence. He stated that the officers wanted to seize "any controlled substances, moneys, notes plus legers [sic], glass ware, tubs, any clandestine lab materiels [sic], etc." He failed to write the items to be seized on the face of the search warrant, however, and the warrant did not contain language incorporating the

application and affidavit. He did check boxes on the warrant which described the property to be seized as "Property that has been obtained in violation of law[,] Property, the possession of which is illegal[,] Property used or possessed with the intent to be used as the means of committing a public offense or concealed to prevent an offense from being discovered[, or] Property relevant and material as evidence in a criminal prosecution."

Sergeant Parks arrived at a state magistrate's residence with the search warrant application at 9:39 p.m. The magistrate read the application and warrant and asked several questions. After telling Parks to add some information to the affidavit and application, she signed the search warrant. The magistrate apparently did not notice that the portion of the warrant describing the items to be seized had been left blank, and Parks testified that he did not realize what had been omitted until the morning of the suppression hearing.

After the magistrate signed the search warrant, Sergeant Parks called the officers at Lloyd's residence and informed them that he had obtained a warrant. He then went to his office to make copies and returned to Lloyd's residence. Other officers had meanwhile entered the building, but the district court found that the search did not begin until after Parks arrived with the warrant, a finding which Lloyd contests. During the search officers seized the methamphetamine lab that had been seen during the initial entrance into the residence, 10.99 grams of powdered methamphetamine found in plain view in the same room as the lab, 471.97 grams of marijuana, and five rounds of ammunition. There was evidence at the suppression hearing that the methamphetamine was in an uncovered bowl on the floor below an open counter, next to a heater, hose, and gloves.

A grand jury indicted Lloyd on charges of possession of methamphetamine with intent to distribute after having previously been convicted of one or more felony

drug offenses,[2] in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 851 (count one); possession of marijuana with intent to distribute after having previously been convicted of one or more felony drug offenses, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), and 851 (count two); and possessing ammunition in and affecting commerce after having previously been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (count three). Lloyd moved to suppress evidence obtained from the search of his residence on the ground that the search warrant was defective because it failed to list the items to be seized.

The district court adopted a magistrate judge's report and recommendation to deny the motion. It concluded that the officers had authority to enter Lloyd's residence to execute the arrest warrant because they had a reasonable belief that Lloyd was present, that the officers could have seized the methamphetamine laboratory under the plain view doctrine, and that the subsequent search pursuant to the defective search warrant was made in good faith.

After the motion to suppress was denied, Lloyd entered a conditional guilty plea to count one of the indictment, which charged him with possession of methamphetamine with intent to distribute. As part of the plea agreement, Lloyd maintained the right to appeal the denial of his suppression motion and the government dismissed counts two and three. The counts based on the marijuana and ammunition found in the search were thus both dismissed.[3] Lloyd was then sentenced to 151 months imprisonment. He now appeals from the court's suppression order.

---

[2]In March 1990 Lloyd had been convicted of delivering cocaine, in violation of Iowa Code § 124.401.

[3]Because of the amount of methamphetamine for which Lloyd was held responsible, his base offense level was not affected by the marijuana found in his residence and the ammunition was not factored into the calculation of his sentence.

Lloyd argues that the district court erred by applying the <u>Leon</u> good faith exception to the exclusionary rule, <u>see</u> <u>United States v. Leon</u>, 468 U.S. 897 (1984), and that neither the plain view nor exigent circumstances exceptions to the warrant requirement applied. The government responds that the district court correctly applied the good faith exception and that the search and seizure were also justified under the plain view and exigent circumstances exceptions. We review the factual findings underlying a suppression order for clear error and the court's legal conclusions de novo. <u>United States v. Gabrio</u>, 295 F.3d 880, 882 (8th Cir. 2002).

There is no issue here about the deputies' original entry into Lloyd's residence. A lawful arrest warrant carries with it the authority to enter the residence of the person named in the warrant in order to execute the warrant as long as the officers executing the warrant have a reasonable belief that the suspect resides at and is currently present at the dwelling. <u>Payton v. New York</u>, 445 U.S. 573, 602-03 (1980). This rule applies to misdemeanor warrants as well as to those for felonies. <u>United States v. Smith</u>, 363 F.3d 811, 814 (8th Cir. 2004); <u>see also</u> <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 750 (1984) ("When the government's interest is only to arrest for a minor offense, ... the government usually should be allowed [to enter the home to execute the arrest] only with a warrant issued upon probable cause by a neutral and detached magistrate.").

Although no one answered the door after the Sylvesters knocked and the deputies were told by Hines that he did not think Lloyd was at home, the officers heard a fan and other noises coming from inside the residence and Hines said he had seen Lloyd there that day. The windows of Lloyd's residence were covered by dark paper, and it was not until the deputies went inside that they learned that the source of the unexplained noises was a dog. We conclude that the district court did not err in its finding that the deputies had a reasonable belief that Lloyd was inside his residence. They were thus entitled to enter to execute the arrest warrant.

The Fourth Amendment provides that no search warrants shall issue without probable cause "supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. To satisfy the particularity requirement of the amendment, a warrant must be sufficiently definite to enable the searching officers to identify the property that may be seized. Steele v. United States, 267 U.S. 498, 503-04 (1925). A search performed under a warrant that does not particularize the items to be seized is unconstitutional. Massachusetts v. Sheppard, 468 U.S. 981, 988 (1984).

In this case the portion of the search warrant for detailing the items to be seized was left completely blank. Even though the description of the items to be seized was included in Sergeant Parks' affidavit in the warrant application, the warrant itself did not contain suitable words of reference to incorporate the affidavit. While there were boxes checked on the warrant to categorize the general type of property to be seized, the warrant did not refer the reader to the affidavit for a specific description. See United States v. Curry, 911 F.2d 72, 76-77 (8th Cir. 1990).

Evidence seized as the result of an illegal search is generally inadmissible, Mapp v. Ohio, 367 U.S. 643, 655-57 (1961), but the law has developed exceptions to that rule. The district court relied on an exception to the warrant requirement in denying Lloyd's motion to suppress, holding that the officers had acted "in objectively reasonable reliance on a subsequently invalidated search warrant." United States v. Leon, 468 U.S. 897, 922 (1984).

Lloyd argues that this search warrant was so facially deficient by failing to list the items to be seized that the executing officers could not have reasonably presumed it to be valid. He contends that this was the type of warrant mentioned in Leon that no officer could have reasonably relied on. Id. at 923 ("[D]epending on the circumstances of the particular case, a warrant may be so facially deficient–*i.e.*, in failing to particularize the place to be searched or the things to be seized–that the

executing officers cannot reasonably presume it to be valid."). Lloyd also cites the Supreme Court's recent decision in Groh v. Ramirez, 124 S. Ct. 1284 (2004), a constitutional damages action involving a warrant that did not at all describe the items to be seized. The Court held there that the defending officer was not entitled to qualified immunity because "no reasonable officer could believe that a warrant that did not comply with [the particularity] requirement was valid." Id. at 1293-94. Lloyd argues that the officers here did not rely on the warrant because they entered his residence before Parks returned with the warrant. He also points out that Parks did not notice the omissions until the morning of the suppression hearing.[4]

The government asserts that the exclusionary rule is designed to deter police misconduct and there was none here, for the deficiency in the warrant was caused by a clerical error or negligence rather than misconduct. See Leon, 468 U.S. at 921. It notes that there were boxes checked on the face of the warrant describing the type of property to be seized and it argues that it was objectively reasonable for Sergeant Parks to rely on a search warrant signed by a magistrate. Groh does not rule out the good faith exception in this case it argues, because there was exigency during the drafting of the warrant application and during the search itself. Groh, 124 S. Ct. at 1294 n.9 (pointing out that the officer there had not contended that any sort of exigency existed during his drafting time or when he conducted the search).

We conclude that we need not reach the Leon good faith exception in this case because the search of Lloyd's residence was justified on other grounds.[5] Objects in

---

[4]An additional argument, that the Iowa Supreme Court does not apply Leon to state actors, has no effect in this federal case. United States v. Maholy, 1 F.3d 718, 721 (8th Cir. 1993).

[5]We note in passing that the circumstances here are quite different from those in Groh where there was no exigency and the search was not even conducted until the day after the warrant was issued. Here, after spotting an active methamphetamine lab,

plain view of an officer properly in position to view the objects may be seized and admitted into evidence. Harris v. United States, 390 U.S. 234, 236 (1968). Lloyd concedes that the methamphetamine lab seen by the deputies when they entered with the arrest warrant was in plain view, but he contends that the methamphetamine in the bowl was not discovered until the later search with the defective search warrant and it must therefore be suppressed. The government argues that exigent circumstances entitled the officers to seize the items they saw in plain view underneath the counter.

The dangers created by methamphetamine labs can justify an immediate search because of exigent circumstances "[d]ue to the volatile nature of such labs." Kleinholz v. United States, 339 F.3d 674, 677 (8th Cir. 2003). When the deputies first entered Lloyd's residence, they smelled a strong odor of ether and they also saw the methamphetamine lab in plain view. In similar circumstances we have recognized an immediate right to search. The officers in Kleinholz also smelled ether outside a residence where they had gone to investigate an anonymous tip about a methamphetamine lab. We held they were entitled to enter to search for a lab and that once it was seen, they could lawfully reenter to reduce the immediate risks of fire and explosion posed by such labs. Id. Similarly, in United States v. Walsh, 299 F.3d 729 (8th Cir. 2002), a limited search without a warrant was upheld where officers had probable cause to believe they had discovered a methamphetamine lab. As the court noted there, the "potential hazards of methamphetamine manufacture are well

_____

the officers vacated the building for safety reasons, secured the perimeter, called in the DEA, and sent Parks to obtain a search warrant which was issued by a magistrate after information was added at her request. Although Parks had to fill out the papers by hand because his computer and typewriter were not functioning, there was no deliberate delay or indifference to the warrant requirement. These officers faced the type of situation recognized by the Groh Court in which "'officers in the dangerous and difficult process of making arrests and executing search warrants' require 'some latitude.'" Groh, 124 S. Ct. at 1294 n.9 (quoting Maryland v. Garrison, 480 U.S. 79, 87 (1987)).

documented, and numerous cases have upheld limited warrantless searches by police officers who had probable cause to believe they had uncovered an on-going methamphetamine manufacturing operation." Walsh, 299 F.3d at 734 (collecting precedent from other circuits).

Here the deputies entered Lloyd's residence to execute the arrest warrant and saw the methamphetamine lab in plain view. At this point the deputies could have proceeded with a limited search under the exigent circumstances exception to the warrant requirement because once they "entered the house legally ... they were not required to ignore the illegal drug operation." Kleinholz, 339 F.3d at 677. The fact that Parks nevertheless went to obtain a search warrant shows the officers' respect for the Fourth Amendment despite the exigent circumstances they encountered. Because of the unexpected problems Parks experienced with his computer and typewriter, the warrant application process was delayed.

Lloyd contends that the exigent circumstances exception does not apply because the deputies did not seize the methamphetamine until three and a half hours after they initially arrived at his residence, not until after Sergeant Parks returned with a search warrant. That delay did not mean that the exigent circumstances ended before the second entry. Our cases have recognized that dangers may continue for some hours. For example, in Walsh the exigency created by a methamphetamine lab still existed some two hours after it was discovered on an initial entry. Walsh, 299 F.3d at 734. Similarly, at the time the officers reentered Lloyd's residence the dangers inherent in a methamphetamine lab continued to exist. Nothing in the record suggests that the existing exigency had disappeared by the time the officers reentered the building. No steps had been taken in the interim to dismantle the lab, and only the outside perimeter had been secured.

After the officers reentered the building to dismantle the methamphetamine lab, they saw the bowl with the methamphetamine on the floor in plain view. On their

original entry into the darkened bedroom, they had spotted the lab with the aid of their flashlights, but they had not seen the methamphetamine. When they went back inside the bedroom where the lab was located, they saw the methamphetamine in a bowl on the floor under an open counter, near a heater, hose, and gloves. Sergeant Parks testified at the suppression hearing that they took photographs of the scene as they found it, that exhibits 6 and 10 accurately depicted it, and that the methamphetamine shown in exhibit 10 was found in plain view.

We conclude that in the circumstances of this case, neither the officers' reentry into the building nor the discovery of the methamphetamine in the bowl violated the Fourth Amendment. Exigent circumstances continued to exist at the time the officers reentered the building, and the plain view exception to the warrant requirement justified the seizure of the methamphetamine found in the same room as the lab.

Accordingly, we affirm the judgment of the district court.

HEANEY, Circuit Judge, dissenting.

I respectfully dissent. The majority has taken a rather simple but important case and converted it into a complex one. The sole issue to be decided is whether the defendant's motion to suppress methamphetamine seized from his premises should have been granted. Whether the law enforcement officers who conducted the search saw a methamphetamine lab when they entered the premises is irrelevant, because the sole charge to which Lloyd pled guilty was possession with intent to distribute methamphetamine, and the record evidence establishes that the officers did not see any methamphetamine or other contraband during their initial entry and search of Lloyd's apartment.

The government initially sought to justify the search and seizure of the methamphetamine on the basis of the search warrant they obtained from a magistrate.

-11-

The district court rejected this approach, but held that because the officers acted in good faith in preparing and serving the warrant, which led to discovery of the methamphetamine, the methamphetamine should not be suppressed. The majority holds that the search warrant was defective, and also rejects the good-faith analysis employed by the district court. I agree with the majority on both counts. Thus, the search and seizure of the methamphetamine can only be justified if the government established that an exception to the warrant requirement permitted its otherwise unconstitutional intrusion. The majority relies on Kleinholz to support its view that exigent circumstances justified the search and seizure of the methamphetamine. In my view, that reliance is clearly misplaced. In Kleinholz, this court, relying on Collins, stated that

> [O]nce law enforcement had entered the house legally, pursuant to probable cause and exigent circumstances, they were not required to ignore the illegal drug operation; rather, they were free to take note of and even seize anything in "plain view." . . . . "Under the plain view doctrine, police may seize an object without a warrant if (1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself."

Kleinholz, 339 F.3d at 677 (quoting United States v. Collins, 321 F.3d 691, 694 (8th Cir. 2003)) (citation omitted) (emphasis added).

Here, the government has not met its burden of showing that the methamphetamine seized, and the basis of the charge of conviction, was in plain view. On the contrary, the only evidence adduced on this point at the suppression hearing came from Lloyd's attorney; the government did not even broach the topic in its presentation. Nick Hamilton, an officer with the Linn County Sheriff's Department, testified that he was present during the initial entry into Lloyd's dwelling and actually took part in the initial, cursory search. He stated that he entered Lloyd's

-12-

residence and made certain that no one was present inside before exiting.  Under questioning from Lloyd's attorney, Hamilton asserted unequivocally that none of the contraband that supports charges against Lloyd was found during this entry and search:

> Q.    Okay.  So at no time in your initial entry did you find the methamphetamine?
> A.    No.
> Q.    Okay.  Did you find the marijuana during your initial entry?
> A.    No.
> Q.    Okay.  What about the shotgun shells?
> A.    No.

(Suppression Hr'g. Tr. at 69.)

To accept the majority's position, one must first accept that there actually *were* exigent circumstances (that is, an emergency situation) which would have justified a more thorough search of Lloyd's residence.  Still, since the methamphetamine was admittedly not in plain view, just a search of the residence would not suffice to sustain the district court's judgment.  Rather, one must go even further, and accept the speculative and unsupported proposition that such a search–purportedly designed to extinguish any exigency–would be so extensive that it would have necessarily resulted in the discovery of the methamphetamine.  This we should not do.  I therefore respectfully dissent.

------------------------------------