PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

      *Plaintiff-Appellee,*

v.

TORRANCE G. HILL,

      *Defendant-Appellant.*

No. 10-4320

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Anthony J. Trenga, District Judge.
(1:09-cr-00454-AJT-1)

Argued: March 23, 2011

Decided: August 18, 2011

Before GREGORY, AGEE, and KEENAN, Circuit Judges.

---

Vacated and remanded with instructions by published opinion. Judge Gregory wrote the majority opinion, in which Judge Keenan joined. Judge Agee wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Caroline Swift Platt, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Mysti Dawn Degani, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

**ON BRIEF:** Michael S. Nachmanoff, Federal Public Defender, Kevin R. Brehm, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Neil H. MacBride, United States Attorney, Michael P. Ben'Ary, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee

---

**OPINION**

GREGORY, Circuit Judge:

This case is about the "centuries-old principle of respect for the privacy of the home." *Wilson v. Layne*, 526 U.S. 603, 610 (1999). Defendant, Torrance G. Hill, filed a motion to suppress evidence obtained in his residence without a warrant. The district court denied the motion, and determined that the police acted legally when they entered Hill's home. Hill subsequently entered a conditional guilty plea while reserving his right to appeal the denial of his motion to suppress. We now hold that the district court erred in finding that the police's initial entry into the house was valid, but that it properly found Ms. Alvarez's consent for the second search was valid. We remand to the district court for a determination as to whether the taint from the initial illegal entry into the house was dissipated by Ms. Alvarez's consent.

I.

The pertinent facts of this case take place over the span of a month and a half. On June 25, 2009, Hill was informed by Virginia State Trooper Cox that his license was suspended. When asked, Hill gave the officer an address in Alexandria, Virginia. Hill testified that he told Trooper Cox that the address was out of date because he could not remember his new mailing address in Lorton, Virginia (hereinafter "the Lor-

ton townhouse") where he had moved with his girlfriend, Ms. Alvarez, and their eight-year-old son in May of 2009.

On July 12, 2009, Officer Albert from the Fairfax Police Department approached a group of men, including Hill, who were allegedly loitering, and obtained their identification. Later, after the men had dispersed, Officer Albert discovered an electronic scale and concealed marijuana near where the group of men were gathered. Early the next morning, he swore out an affidavit to obtain an arrest warrant for Hill. The warrant for Hill's arrest listed his address as "unknown."

On July 17, 2009, Ms. Alvarez called 911 from the Lorton townhouse because of an argument she was having with Hill. Ms. Alvarez testified at the suppression hearing that she hung up the phone before speaking with the 911 operator, but Officer Coligan was dispatched to the Lorton townhouse nonetheless. Ms. Alvarez also testified that the argument did not involve physical violence. Officer Coligan testified that when he arrived Ms. Alvarez told him that Hill resided at the Lorton townhouse, but had left because of the outstanding warrant for his arrest. Officer Coligan also testified that the door frame of the house was damaged when he arrived, and he discussed having it fixed by the landlord with Ms. Alvarez. He forwarded his report to Sergeant Milam from the warrant department.

Hill spent more than half of his nights at the Lorton townhouse between the July 17th incident and July 29th, 2009, but this was not known to police at the time.

On July 29, 2009, Sergeant Milam, Detective Studer, Officers Pleva, and Officer Kroll from the Fairfax Police Department arrived at the Lorton townhouse with a warrant for Hill's arrest. The warrant indicated that Hill's address was unknown. Sergeant Milam testified that he thought there was an eighty percent chance that Hill would not return to the Lorton townhouse to avoid being apprehended by police. Instead,

Sergeant Milam reported, the police were trying to communicate with Ms. Alvarez concerning Hill's whereabouts.

Upon arrival, the police knocked on the door. They heard noises which they believed could have been voices or the television. The noises were completely unresponsive to police knocking. Milam noted that the doorframe was damaged. He placed a call to Ms. Alvarez who indicated that she was at work and that the only person who could be at the Lorton townhouse was her sister. Neither the police nor Ms. Alvarez expressed concern about Ms. Alvarez's sister's safety, and, notably, Milam did not obtain consent to enter the house during this conversation. Shortly thereafter, Milam decided to turn the doorknob and opened the door. Upon opening the door, Milam discovered Hill and a friend sitting on the couch. They confiscated Hill's phone, which had a text message from Ms. Alvarez indicating that the police were at the front door.

Officer Pleva conducted a protective search of the home allegedly looking for Ms. Alvarez's sister. Pleva also testified he smelt burnt marijuana. The officers located a small amount of marijuana and a grinder on the kitchen table. About an hour later, upon arriving home from work, Ms. Alvarez gave her consent to search the house. There is a factual dispute about whether Ms. Alvarez freely gave her consent to search the house. Despite her allegedly valid consent, police took steps to obtain a search warrant. However, the search of the Lorton townhouse was conducted by the time the search warrant was executed by Officer Kroll. The search turned up a two-shot revolver, an empty holster, a bulletproof vest, scales, ammunition, marijuana, and crack cocaine.

Hill was charged in a superseding indictment with one count of possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a) and one count of possession of a firearm in connection with a drug trafficking crime in violation of 18 U.S.C. § 924(c).

Before trial, Hill filed a motion to suppress evidence obtained as a result of the search of the Lorton townhouse. The court denied the motion first orally and later in a written order.

Hill entered a conditional plea of guilty to the first count while retaining his right to appeal the denial of his motion to suppress. The district court entered a judgment of conviction and sentenced him to 120 months of incarceration. Hill timely appealed.

## II.

On appeal from a motion to suppress, this Court reviews the factual findings of a district court for clear error, and reviews legal determinations de novo. *United States v. Kellam*, 568 F.3d 125, 132 (4th Cir. 2009).

This case requires an analysis of four doctrines in order to determine whether or not the fruits of the search of Hill's home should be suppressed. First, we determine whether the search of Hill's residence was justified as a valid execution of Hill's arrest warrant. Second, we determine whether the exigency doctrine permits entry into the house. Third, we determine whether Ms. Alvarez's consent to search the house was valid. Finally, we determine whether the taint from the initial entry was dissipated by Ms. Alvarez's consent.

### A.

#### i.

The police did not have sufficient reasons upon which to base their belief that Hill was present in the home to execute their arrest warrant. In *Payton v. New York*, the Supreme Court concluded that police may enter into a home without a search warrant in order to execute an arrest warrant only if "there is reason to believe [that the subject of the warrant] is

within." 445 U.S. 573, 602 (1980). Generally, circuits have broken the analysis of whether the entry was lawful into two conjunctive parts: (1) whether there is reason to believe that the location is the defendant's residence, and (2) whether or not there was a "reasonable belief" that he would be home. *See, e.g., United States v. Graham*, 553 F.3d 6, 13 (1st Cir. 2009); *United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. 1995), *cert. denied*, 116 S. Ct. 189 (1995).

Circuits have employed a variety of approaches in defining reasonable belief and its relationship to probable cause. Some circuits have found that reasonable belief is the same as probable cause. *See United States v. Hardin*, 539 F.3d 404, 416 (6th Cir. 2008) (probable cause is the correct standard to use in determining an officer's reasonable belief that the subject of a warrant is present in the home); *United States v. Gorman*, 314 F.3d 1105, 1114 (9th Cir. 2002) (same); *see also United States v. Jackson*, 576 F.3d 465, 469 (7th Cir. 2009) (noting an inclination to believe "that 'reasonable belief' is synonymous with probable cause.").

Other circuits have simply found that the distinction between reasonable belief and probable cause is indefinite or negligible. *See United States v. Barrera*, 464 F.3d 496, 501 n.5 (5th Cir. 2006) (noting that the distinction between probable cause and reasonable belief is "more about semantics than substance"), *cert. denied*, 550 U.S. 937 (2007); *Magluta*, 44 F.3d at 1535 (noting that it is "difficult to define the *Payton* 'reason to believe' standard, or to compare the quantum of proof the standard requires with the proof that probable cause requires.").

While still other circuits have found that the requirements of reasonable belief are something less than probable cause. *See United States v. Thomas*, 429 F.3d 282, 286 (D.C. Cir. 2005) ("reasonable belief" requires less than probable cause), *cert. denied*, 549 U.S. 1055 (2006); *Valdez v. Machetes*, 172 F.3d 1220, 1227 n.5 (10th Cir. 1999) (same); *United States v.*

*Later*, 57 F.3d 212, 215 (2d Cir. 1995) (same). A final set of circuits has taken no position as to the relationship between "reasonable belief" and probable cause. *United States v. Weems*, 322 F.3d 18, 22 (1st Cir. 2003); *United States v. Rise*, 83 F.3d 212, 216 (8th Cir. 1996); *United States v. Edmonds*, 52 F.3d 1236, 1248 (3d Cir. 1995), *vacated in part on other grounds*, 52 F.3d 1251.

In light of the diverse views taken by our sister circuits, we decline to reach a conclusion as to whether 'reason to believe' is as stringent as 'probable cause' because we conclude below that the police entry was not justified even under the less stringent interpretation of the standard.

ii.

Next we apply the two-part test to determine whether police could lawfully enter Hill's home to execute their arrest warrant. First, we must decide whether police had reason to believe that the Lorton townhouse was Hill's residence. At the suppression hearing, Hill essentially conceded this point because in order to have standing to contest the search he had to establish that he had an expectation of privacy at the residence. Additionally, the report stemming from Ms. Alvarez's domestic violence call stated that the Lorton townhouse was his residence. Therefore, we find that there was reason to believe that Hill was a resident of the Lorton townhouse.

The second part of the test is whether or not the police had reason to believe that Hill was present; and we conclude that the evidence weighs against so finding. First, there is testimony from Sergeant Milam, the lead officer on the scene, that he did not believe Hill would be present at the home since he had previously been identified at the home by police and fled. Milam even stated that he believed there was an eighty-percent chance Hill would not be present.[1] In fact, Officer

---

[1]It is true that the subjective beliefs of an officer are not relevant here. *Whren v. United States*, 517 U.S. 806, 813-814 (1996). However, Sergeant

Kroll, another arresting officer, characterized the trip to the residence as a "follow up visit to the residence to gain information in regards to a fugitive investigation that [Sergeant Milam] was conducting." J.A. 171. Additionally, the police had documented another primary residence for Hill based on this recent traffic citation, further lessening the chances that Hill would be present in the home.

The officers relied on hearing unresponsive noises from inside the house, which could have been voices or a television, to support their belief that Hill was present. However, noise coming from inside of a house is not enough to give the police a reason to believe that a defendant is present. This is especially true because *before entering the house*, Sergeant Milam was informed by a resident of the house, Ms. Alvarez, that Hill was not there and that the noise was most likely coming from her sister who might have been in the house.

In the Fourth Circuit, courts have sanctioned entry only where multiple facts support a reason to believe that the subject of the arrest warrant is present at the time of entry. *See, e.g.*, *United States v. Young*, 609 F.3d 348 (4th Cir. 2010) (finding that where police established surveillance of the home, were sure that the subject of the arrest warrant was present, and had just confiscated drugs from someone exiting the home, *Payton* supported entry into the home); *United States v. Morgan*, No. 92-5068, 1992 U.S. App. LEXIS 20235, at *2 (4th Cir. Aug. 4, 1992) (unpublished) (the police "observed that the interior lights were on and that Morgan's car was parked at the rear of the house" and "saw Morgan run across the yard toward his house.").

---

Milam's belief was held as a result of the objective fact that Hill was unlikely to return to a residence he had recently fled in order to avoid contact with the police. As such, Milam's view is evidence of a reasonable reading of the objective facts from an experienced officer's perspective.

The government also relies on several cases from outside the Fourth Circuit to conclude that they had sufficient evidence that Hill was present in the home to justify their entry. For instance, it relies on *United States v. Lloyd* for the proposition that noise inside a house is sufficient to give police a reason to believe someone is inside. 396 F.3d 948 (8th Cir. 2005). However, in that case, police had a complaint from neighbors about an abandoned car, the smell of ether emanating from the house, noise from a fan and other sources coming from inside the house, as well as evidence from a neighbor that the defendant had been home earlier that day. *Id.* at 950-952. These robust facts point to a far more sound conclusion that someone, specifically the defendant, was present at the time of the entry.[2]

Similarly, the government's reliance on *United States v. Route* is misplaced. 104 F.3d 59 (5th Cir. 1997). In *Route* the police had more facts to rely on in determining that they had a reasonable belief that the defendant would be present. These facts included that the home was defendant's primary residence, a known co-conspirator was seen leaving the house shortly before the search, there was a television on inside the house, and an additional car was parked in the driveway. *Id.* at 62.[3]

In all of these cases, the police had several reasons to believe that the subject of the warrant was present. Here, at best, the police had reason to believe that someone was present and that the individual inside was Ms. Alvarez's sister. We find that in order to have reason to believe that the defendant is in the home, police cannot solely rely on an unidentified noise coming from within the home.

---

[2]The court in *Lloyd* also relied on the fact that the smell of ether permitted the officers to enter the home as a result of the exigent circumstances. *Id.* at 955.

[3]The government also cites *United States v. Philips*, 593 F. 2d 553, 556 (4th Cir. 1978), but this case has no precedential value since it was decided before *Payton* and thus analyzed the issue according to a different test.

Therefore, we conclude that the officers' entry into Hill's home was not a proper entry in order to execute an arrest warrant.

B.

The government also contends that its entry was justified by the exigency doctrine. The district court, in determining that the exigency doctrine would apply, provides scant reasoning except to say that "the Court finds that it would have been reasonable for [the police] to enter or certainly simply open the door to determine whether the sister was facing some safety issues." J.A. 268. We disagree and hold that the evidence does not support a finding that the entry was justified by the exigency doctrine.

In analyzing whether exigent circumstances justified a warrantless search, we ask whether the circumstances would cause an officer to have an "objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992). The Supreme Court has emphasized that "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action." *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (citation and quotations omitted). Examples of such emergencies include "to assist persons who are seriously injured or threatened with such injury." *Id.* at 403.

This Court recently cited with approval a non-exhaustive list of factors to consider:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of

danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that police are on their trail; and (5) the ready destructibility of the contraband.

*United States v. Mowatt*, 513 F.3d 395, 399 (4th Cir. 2008) (citation omitted). In the present case, only the first factor is alleged by the government, and we proceed with an analysis of whether there was sufficient evidence of urgency to justify police entry.

The Supreme Court has found that where officers were called to a house, observed underage drinking, and an altercation, the exigency doctrine was correctly applied. *See Brigham*, 547 U.S. at 407. For this doctrine to justify an entry, courts require police to have substantial evidence of wrongdoing or imminent danger. *See States v. Taylor*, 624 F.3d 626 (4th Cir. 2010) (police sought to identify the parents of a four year old child, and she identified the house as being her residence); *United States v. Dean*, No. 06-5028, 243 F. App'x. 780, 782 (4th Cir. July 17, 2007) (unpublished) (police had reports of a gas leak in a wood framed house); *United States v. Jones*, 204 F.3d 541, 543 (4th Cir. 2000) (where defendant placed a small baggy with white powder in his mouth and walked into a residence); *United States v. Masko*, No. 99-4681, 2000 U.S. App. LEXIS 19057 (4th Cir. Aug. 9, 2000) (unpublished) (where an occupant of a motel room asked the staff to call 911); *cf. Hunsberger v. Wood*, 570 F.3d 546, 549 (4th Cir. 2009) (in a civil case against a police officer, the court determined that "circumstances confronted by defendant on the night in question suggested that plaintiffs' home was being vandalized and that a missing teenage girl was in the house and in need of assistance" and therefore he acted properly).

Where the police have evidence that the danger in question was not imminent, an entry is not justified. *United States v. Shea*, No. 99-4723, 2000 U.S. App. LEXIS 15441 (4th Cir.

June 30, 2000) (unpublished) (police received a call that defendant was engaged in underage sex and found defendant outside the room, and therefore, had no reason to believe that underage girl was in danger and subsequent search was illegal).

Here, the police did not have a sufficiently reasonable basis to justify this entry under the exigency doctrine. The factors Sergeant Milam identified to support his contention that his emergency entry was justified are not sufficient. First, Milam suggests that "the door appeared to be very old, and [he] noticed around the frame and the top area to be some damage to the frame *a little bit like* it had been previously kicked in or broken in." J.A. 140 (emphasis added). However, slight damage to a door frame is not sufficient to justify an entry without a warrant.[4]

Second, Sergeant Milam expressed concern that there was someone inside the house who was not answering and "that's not normal behavior." J.A. 141. Again, this is simply not sufficient evidence to support a warrantless entry into a private home without some articulable fact that justified urgent entry by police. This is especially true since the unresponsive noise could easily have been a television or radio accidentally left on.

Next, Milam indicated that he was concerned about Ms. Alvarez's sister who he was told might be home, but was not answering the door. However, Milam can point to nothing

---

[4]Practically speaking, if the police had concerns about the door frame they could have asked Ms. Alvarez about it while they were talking to her on the phone. Instead of taking the extreme step of entering a private home without a warrant, the police had a clearly less invasive means of ascertaining what, if anything, was transpiring within the house. Ms. Alvarez was cooperative and forthcoming from the perspective of the police having previously informed them that Hill fled as a result of an outstanding warrant.

that would suggest that Ms. Alvarez's sister was in distress or required police assistance.

Milam also expressed concern about Ms. Alvarez because she had previously called the police to remove Hill. However, any concern about Ms. Alvarez and Hill should have been eliminated when Milam spoke with Ms. Alvarez who was at work and who had assured him that she was fine and suggested her sister would be the only one in the house. Additionally, the 911 call that Ms. Alvarez placed was weeks before the search and no allegations of violence were made against Hill.

Finally, Milam indicated that he heard what sounded like someone attempting to lock a latch on the door. However, the door was not locked when police entered. Furthermore, this evidence does not point to any exigency. Circuit precedent supports a finding that entry was not justified. In *Moss*, a Forest Service Officer noticed a car parked illegally along the side of the road in a national park. *Moss*, 963 F.2d at 674. He radioed to dispatch and was wrongly told that the closest cabin was unoccupied. *Id.* at 675. When he came upon the cabin, he discovered fresh bike tracks and an unlocked door. *Id.* He proceeded to search the cabin and discovered marijuana. *Id.* This Court concluded that his search of the cabin was not justified under the exigency doctrine because there was no evidence of "an emergency that required immediate identification of the occupants in order to give them assistance — or indeed that assistance was needed." *Id.* at 679.

This case is very much like *Moss* in several respects. In both cases, the officer was under some mistaken impressions, which led to his suspicion. In *Moss* it was that the cabin was not occupied, and, in this case, that the damage on the door was recent.[5] Similarly to *Moss*, and unlike cases where the

---

[5]In fact, police had previous knowledge that the door frame had been damaged because when the police were called to the house on July 17, 2009, the damage was noted.

exigency doctrine has been applied, there were no reports of yelling from within the home that would support a sense of emergency or signals of distress.

The Fourth Amendment protects the rights of citizens to refuse to have their homes searched. In order for a search to be legal, the police must have a warrant or their conduct must fall within an exception to the Fourth Amendment. We hold that damage to the door, unsupported hunches of the police, and noises from within are not sufficient to suggest that there was an emergency taking place inside the residence.

Therefore, we find that the initial entry into the Lorton townhouse was unlawful.

## C.

Having concluded that the initial entry into the house was unlawful, we turn our analysis to the issue of whether the consent provided by Ms. Alvarez was valid. "The voluntariness of consent to search is a factual question, and as a reviewing court, we must affirm the determination of the district court unless its finding is clearly erroneous." *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996). District courts are given deference where their determination on the issue of consent is based on oral testimony where they had an opportunity to make a credibility determination. *Id.* at 651.

The district court concluded, after weighing the evidence presented to it by Ms. Alvarez and the police, that Ms. Alvarez's consent to the search of her home when she arrived after Hill's arrest was voluntary. The district court credited the officer's testimony over that of Ms. Alvarez. We can find nothing on the record which would support a finding that the district court committed clear error in determining that the consent was valid.

## D.

We have determined that the initial entry into the Lorton townhouse was illegal, but that Ms. Alvarez gave her valid consent to the search. Therefore, it becomes necessary to evaluate whether the taint from the initial illegal search was dissipated when Ms. Alvarez gave her consent for the second search.[6]

This Court must evaluate whether the taint is sufficiently dissipated using the "fruit of the poisonous tree" doctrine. *Wong Sun v. United States*, 371 U.S. 471 (1963). In *Brown v. Illinois*, the Supreme Court articulated three factors that are used to determine whether the taint from an illegal search has dissipated: (1) the time between the Fourth Amendment violation and the consent, (2) the presence of intervening circumstances, and (3) the flagrancy of the official misconduct. 422 U.S. 590, 603-04 (1975). In evaluating whether the taint has dissipated, courts conduct a case by case analysis of the facts. *United States v. Ceccolini*, 435 U.S. 268, 276 (1978).

If the government wishes to argue that taint from an initial search is dissipated by the validly obtained consent, it bears the burden of so showing. *United States v. Seidman*, 156 F.3d 542, 548 (4th Cir. 1998).

We have previously found that an individual's consent can be sufficient to dissipate the taint of an illegal search. *See Seidman*, 156 F.3d at 548 (taint had dissipated from an informant's illegal entry into subject's house when he was warmly greeted by subject who explained not answering the door because he was in the basement and carried on a 45 minute conversation with informant); *see also United States v.*

---

[6]In the initial briefing for this case, neither party raised this issue. However, the court ordered additional briefing with respect to this issue prior to oral argument. Since the burden to prove dissipation rests with the government, this question was not waived by Hill.

*Meece*, 580 F.3d 616, 619 (7th Cir. 2009) (a girlfriend's consent was sufficient to dissipate taint where the court found she was not influenced by news of arrest and wanted police to find any guns in her home to protect her children). But in other cases, we have found that consent does not dissipate the taint. In *United States v. Gooding*, we found that an illegal *Terry* stop tainted all subsequently obtained evidence even when the defendant consented to the search. 695 F.2d 78, 84 (4th Cir. 1982). Other courts have also found that consent does not necessarily dissipate the taint. In *United States v. Alvarez-Manzo*, the Second Circuit found that consent to search a wallet subsequent to a Fourth Amendment violation where police seized defendant's bag from the bus cargo did not dissipate the taint. 570 F.3d 1070, 1077 (8th Cir. 2009). The court relied on the fact that the government bears the burden of showing that the taint has dissipated. *Id.*; *see also United States v. Valentine*, 539 F.3d 88 (2d Cir. 2008) (man's arrest and search of car were illegal, the police proceeded to his apartment and, with the consent of his girlfriend, searched it, the court remanded the case to district court to determine whether the subsequent search of the apartment was lawful); *United States v. Jaquez*, 421 F.3d 338 (5th Cir. 2005) (consent to search car given after illegal traffic stop not sufficiently an act of free will to break causal chain of events flowing from constitutional violation); *United States v. Washington*, 387 F.3d 1060, 1063 (9th Cir. 2004) (written consent did not dissipate taint); *United States v. Yousif*, 308 F.3d 820 (8th Cir. 2002) (consent does not always purge prior illegal action); *United States v. Caro*, 248 F.3d 1240 (10th Cir. 2001) (same); *United States v. Valdez*, 931 F.2d 1448 (11th Cir. 1991) (same).[7]

---

[7]The government's reliance on *United States v. Liss* is misplaced since the majority in that opinion does not even perform a *Brown* analysis. 103 F.3d 617 (7th Cir. 1997). Furthermore, in a concurrence, Judge Ripple characterized the majority opinion's failure to consider *Brown* as "frontal assault on the precedents of the Supreme Court of the United States and this Court". *Id.* at 622.

In a similar case, the Eleventh Circuit has taken a more limited view of the taint doctrine. In *United States v. Delancy*, the Eleventh Circuit found that the written and oral consent from a girlfriend was sufficient to dissipate the taint of the illegal entry by police. 502 F.3d 1297, 1309 (11th Cir. 2007). The case before us is factually different in two ways: (1) the police obtained written consent in *Delancy*, and (2) the girlfriend in *Delancy* did not arrive home to multiple police officers already in her home after learning of the arrest of her boyfriend.

The first factor that the Supreme Court identified in *Brown* requires us to consider the time that elapsed between the initial "illegal" search and the subsequent consent. There is a factual dispute between the parties as to how much time elapsed between the two searches. Since the record is underdeveloped as to this issue, this factor weighs in favor of remanding the case to the district court in order for it to conduct a further factual inquiry.

The second factor to consider is the existence and importance of any intervening circumstances. This Court and the Supreme Court have consistently held that an analysis of the voluntariness of a statement is a separate inquiry from determining whether the taint from a Fourth Amendment violation has dissipated. *Cf. Taylor v. Alabama*, 457 U.S. 687, 690 (1982) ("[T]his Court [has] firmly established that the fact that the confession may be 'voluntary' for purposes of the Fifth Amendment . . . is not by itself sufficient to purge the taint of the illegal arrest."). In a concurrence, Judge Michael summarized the Supreme Court jurisprudence on this topic:

> [T]he Supreme Court has found intervening circumstances only when the events were sufficient to break the "causal chain[ ] between the [Fourth Amendment violation] and the statements made subsequent thereto." *Brown* at 602. Examples of intervening circumstance sufficient to break that chain include a

> hearing before a magistrate judge at which the defendant was advised of his rights, *see Johnson v. Louisiana*, 406 U.S. 356, 365 (1972); an arraignment plus a six-day release from custody, *see Wong Sun*, 371 U.S. at 491; and the issuance of a valid search warrant that resulted in the independent discovery of drugs and a spontaneous admission, *see Rawlings v. Kentucky*, 448 U.S. 98, 108-09 (1980). *See also United States v. Wellins*, 654 F.2d 550, 555 (9th Cir. 1981) (finding intervening circumstance when defendant was allowed to consult with his lawyer).

*Seidman*, 156 F.3d at 555.[8]

Here, the continued presence of the law enforcement officers inside the home, subsequent to their illegal search, is a significant consideration in determining whether the taint had dissipated. "[W]here government agents inform a defendant that they have entered his house and are in control thereof and that they have found contraband, there is a strong possibility that the consent is a fruit of the original illegal entry." *United States v. Collazo*, 732 F.2d 1200, 1204 (4th Cir. 1984); *see also Thomas*, 955 F.2d at 211.

Another significant consideration is the fact that the person providing consent in this case was not the defendant, but instead was the defendant's girlfriend, Ms. Alvarez. Additionally, Ms. Alvarez was not present in the home at the time that the police entered the residence.

---

[8]The inevitable discovery doctrine is not appropriate here since "[t]he premise of the inevitable discovery doctrine is that the illegal search played no real part in discovery of incriminating evidence. Only then, if it can be shown that the taint did not extend to the second search, would the product of the second search be admissible." *United States v. Thomas*, 955 F.2d 207, 209 (4th Cir. 1992). Here, it is obvious that the police's desire to search the Lorton townhouse stemmed from the initial illegal search.

There is limited evidence in this record regarding the circumstances surrounding Ms. Alvarez's consent. For example, we do not know: how many police officers were present in the house and whether their weapons were visible; what freedom of movement Ms. Alvarez had during the search; and whether Ms. Alvarez might have to fear prosecution if she did not cooperate. Consequently, we find that no conclusion can be drawn on this factor, and it should be remanded for further development on this issue.

The third factor to consider in this analysis is the flagrancy of the police conduct. This analysis turns at least in part on whether the violation "is the sort of police behavior that the *Brown . . .* test is meant to discourage." *United States v. Miller*, 146 F.3d 274, 279 (5th Cir. 1998). There are numerous factors to consider when evaluating the flagrancy of the conduct. Some factors may weigh in favor of finding the conduct to be flagrant including that the illegal conduct involves "the physical entry of the home[,] [which] is the chief evil against which the wording of the Fourth Amendment is directed." *Payton*, 445 U.S. at 585.

Other factors may weigh in favor of finding the conduct was not flagrant, including that the officers did not use or exploit the evidence that they obtained during the initial search to gain consent. *See Seidman*, 156 F.3d at 549; *see also Delancy*, 502 F.3d at 1313.

It will ultimately be the district court's role to weigh the evidence alongside these factors, and evaluate the flagrancy of the police conduct.

Therefore, since the district court has not addressed this issue, it is appropriate to remand the case for a full factual development of the record and a determination of whether the taint had dissipated by the second search. *Collazo*, 732 F.2d at 1204.

We vacate the district court's denial of Hill's motion to suppress, and remand this matter to develop the record and determine whether Ms. Alvarez's consent was sufficient to dissipate the taint from the initial illegal search of the Lorton townhouse.

Accordingly, this case is

*VACATED AND REMANDED WITH INSTRUCTIONS.*

AGEE, Circuit Judge, dissenting:

As an appellate court, we are to review the record in the light most favorable to the prevailing party below, which, in this case, is the Government. *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008) (stating that when assessing a district court's decision on a motion to suppress, the Court must construe the evidence in the light most favorable to the prevailing party); *see also United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) (stating that "[i]n our deference to fact-finding, we also give due weight to inferences drawn from those facts by resident judges and local law enforcement officers") (internal quotation marks omitted). The majority opinion fails to follow this fundamental rule of appellate review. When the facts are viewed in their proper light under the accepted standard of judicial review, they satisfy the standard set forth in *Payton v. New York*, 445 U.S. 573 (1980), that permits police entry into a dwelling without a search warrant in order to execute an arrest warrant. Accordingly, I cannot join the majority opinion.

## I.

The Supreme Court's decision in *Payton* articulates the relevant standard: "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is *reason to believe* the suspect is within." *Id.*

at 603 (emphasis added). As the majority opinion observes, courts have generally recognized two components of this analysis: first, that the dwelling entered is the residence of the subject of the arrest warrant; and, second, that the police possess "reason to believe the suspect is within" when they enter. *See* Maj. Op. at 5-6 (citing cases).[1]

I agree with the majority that the first prong of the *Payton* analysis is satisfied: the Lorton townhouse was Hill's residence. Not only has Hill conceded this point, but the district court had ample basis on which to conclude that Hill did reside there. Hill does not challenge the district court's determination on appeal, so that issue is not before us. *See Rosenberger v. Rector & Visitors*, 18 F.3d 269, 276 (4th Cir. 1994), *rev'd on other grounds*, 515 U.S. 819 (1995) (holding that appellant's failure to raise an issue in the opening brief results in the issue being abandoned for failure to comply with the requirements of Federal Rule of Appellate Procedure 28(a)).

## II.

Where the majority opinion and I part ways is with respect to the second prong of the *Payton* test: did the police have reason to believe that Hill was present at the Lorton townhouse at the time they entered? A full review of the factual record shows that they did.

Although the majority opinion recites the proper standard of review, it fails to apply that principle. When a motion to suppress has been denied, we are to review the evidence in the light most favorable to the Government. *See Branch*, 537 F.3d at 337. In my view, that is not what the majority opinion does

---

[1]The majority opinion correctly notes a split among the circuits as to what constitutes the "reason to believe" standard. *See* Maj. Op. at 5-6. No published Fourth Circuit case has previously addressed the application of *Payton* in this regard, but I agree with the majority that this is not the proper case to address this issue.

in this case. The majority opinion not only omits any refer-
ence to several factors supporting the conclusion that the
police had reason to believe Hill was inside the residence
entered, but also mischaracterizes portions of the factual
record, the effect of which is to present the evidence in the
light most favorable to Hill and least favorable to the Govern-
ment.

The police learned that Hill resided at the Lorton town-
house after Alvarez placed a 9-1-1 call on July 17, twelve
days before the events at issue in this appeal. The responding
officer, Kirk Coligan, testified that Hill and Alvarez were
arguing. When Officer Coligan asked both of them to "get
back and get down" in order to assess what was happening,
Hill "approached [him] walking towards the front door like he
was about to lay [sic] down on the ground in front of [him].
As soon as [Hill] reached that threshold of the doorway, he
ran from [Coligan]" out the front door and "around another
block of townhouses." (J.A. 113.) Officer Coligan initially
pursued Hill on foot, but broke off the pursuit because he had
no back up and no reason to detain Hill at that time. Officer
Coligan returned to the townhouse and spoke to Alvarez, who
told him she and Hill had an argument after Hill told her there
was a warrant out for his arrest. Alvarez provided Hill's iden-
tity to the officer and gave the Lorton townhome as Hill's
address, indicating that he stayed with her and did not have
a current permanent address elsewhere. Officer Coligan sub-
sequently gave Sergeant Milam this information.[2]

Although this incident provides only background informa-
tion to the subsequent entry of the townhouse, it is particu-
larly significant because it provided the police with specific
information that Hill knew of the arrest warrant, had previ-
ously attempted to flee from police, and therefore would
likely seek to avoid them in the future. Courts have routinely

---

[2]While the majority recites this encounter, it fails to note that Hill fled
the residence upon seeing Officer Coligan.

observed that "officers may take into account the fact that a person involved in criminal activity may be attempting to conceal his whereabouts" when assessing the on-scene circumstances. *See, e.g.*, *United States v. Gay*, 240 F.3d 1222, 1227 (10th Cir. 2001) (quotation marks and citation omitted). This is true even where no specific information is available to suggest that the suspect will avoid the police; it is all the more true where, as here, there is specific evidence to support that belief.

The majority recites the testimony of Sergeant Milam and Officer Kroll that they did not believe Hill would be at the Lorton townhome and that the purpose of their visit was investigational. However, that account does not fully represent the record. The recited testimony is immaterial to the relevant inquiry not simply because it relates Sergeant Milam and Officer Kroll's subjective beliefs, but because it also relates to views held *prior to arriving* at the townhouse. That partial testimony does not account for the circumstances the officers observed and encountered upon arriving at the scene. Our review is based on the totality of the circumstances known to the police at the time they entered the residence. Regardless of the reasons for initially arriving at a residence, police officers can encounter a variety of circumstances once on the scene that may or may not support the conclusion that they possessed the reasonable belief that a suspect would be inside his residence. *E.g.*, *United States v. Werra*, 638 F.3d 326, 338-39 (1st Cir. 2011) (focusing on evidence to support a reasonable belief the suspect was inside the house "at the time [the police officers] entered"); *United States v. Veal*, 453 F.3d 164, 167 (3d Cir. 2006) (same); *Gay*, 250 F.3d at 1227 (same). Sergeant Milam and Office Kroll's testimony neither supports nor detracts from the salient inquiry because their recited views were formed prior to arriving at the residence and assessing the situation first-hand.

To the extent that — as the majority expresses it — the subjective views of Sergeant Milam are relevant as "evidence

of a reasonable reading of the objective facts from an experienced officer's perspective," Maj. Op. at 7-8 n.1, the record shows Milam's belief evolved from that relied on by the majority opinion. Sergeant Milam testified that he had a "sneaking suspicion" Hill would be inside the residence based on how events unfolded once he and the other officers arrived at the townhouse. (J.A. 164.) This "on-scene" assessment was formed precisely at the relevant moment of the proper inquiry as opposed to Sergeant Milam's belief formed prior to going to the residence.

Next, the majority opinion points out that "the police had documented another primary residence for Hill based on [his] recent traffic citation, further lessening the chances that Hill would be present in the home." Maj. Op. at 8. This conclusion is flawed for at least three reasons. First, it calls into question the issue whether the Lorton townhouse was Hill's residence, which — as discussed above and the majority opinion agrees — is not at issue on appeal. The Lorton townhouse was Hill's residence. Second, it conveniently ignores the information Hill *actually* provided to police at the time he received the traffic citation, which was that he no longer lived at the address listed on his driver's license. That driver's license address was *not* the townhouse address. Third, it ignores Alvarez's statement to police days before the search that Hill lived at the Lorton townhouse with her and did not have any other permanent residence.

The majority opinion next discounts the probative value of the noises the police heard from inside the Lorton residence as evidence that Hill was present. When the police arrived at the townhouse, Sergeant Milam knocked on the front door and announced that it was the police. He heard "voices or a TV inside" and "[a]t one point, it sounded like the door—the lock on the door was clicking, but I wasn't for certain what that was." (J.A. 138-39, 149-50; 164; 174.) No one responded to the officers' repeated, loud knocking and announcing. Due to his familiarity with the general layout and size of the town-

houses in that area, Sergeant Milam believed that "it would be pretty much impossible not to hear those knocks." (J.A. 152.)

The noises the police officers heard from inside the townhouse are similar to the noises identified in other cases as part of the totality of the circumstances test. Contrary to the majority opinion's implication, there is no requirement that noises be "responsive" to the officers' knocking in order to be part of an objective basis for believing that an individual is present. *See, e.g.*, *United States v. Lloyd*, 396 F.3d 948, 952 (8th Cir. 2005) (police heard "a fan and other noises," which subsequently turned out to be from a dog); *Valdez v. McPheters*, 172 F.3d 1220, 1226 (10th Cir. 1999) (listing "operation of lights or other electrical devices" as one factor suggesting the presence of an individual inside an unresponsive residence); *see also United States v. Phillips*, 593 F.2d 553, 556 (4th Cir. 1978) (in a case pre-dating *Payton*, holding "[e]manation of a noise from the second floor strengthened [the officers'] conviction of the presence of someone in the apartment," even though the noise was not identified).

Another of the majority opinion's misleading interpretation of the facts concerns Alvarez's statements to Sergeant Milam during their telephone conversation. The testimony at the suppression hearing showed that when no one responded to the knocks, Sergeant Milam called Alvarez's cell phone. Alvarez indicated that she was not at home and that "her sister should be home." (J.A. 102, 140-42, 150-51.) The majority opinion casts this testimony as Alvarez "indicat[ing] that she was at work and that the only person who *could* be at the Lorton townhouse was her sister." Maj. Op. at 4 (emphasis added). The record reflects this characterization is incorrect; Alvarez neither included nor excluded Hill as being in the townhouse. At most, Alvarez's testimony indicates she had no first-hand knowledge because she was not at the townhouse, and that she believed her sister may be there.

Here, Alvarez was at work, and thus had no way of ensuring the veracity of her statements to the police. Instead, she

could only offer her belief based on the information she believed to be true at the time. Significantly, and contrary to the majority opinion's interpretation of her statements, Alvarez offered no tangible information that would lead the police to conclude Hill could not be inside the residence. Viewing all the circumstances, courts have held there to be a reasonable belief to proceed with entering a residence even where an individual on-the-scene states that the suspect is probably — or even definitively — not inside, where other circumstances support a contrary conclusion. *See e.g.*, *Veal*, 453 F.3d at 166 (concluding "reason to believe" existed despite suspect's wife answering the door and informing the police that her husband was not at home); *Lloyd*, 396 F.3d at 952 (concluding "reason to believe" existed despite a neighbor telling the officers he did not think the suspect was home even though he had been there earlier in the day).

At bottom, the majority's review of the factual basis for the officers' determination that Hill was inside the Lorton townhouse does not accurately and fully reflect the facts developed in the district court and does not state those facts in the light most favorable to the Government. Properly viewed, the record below established at least the following facts:

- Hill had fled police at the Lorton townhouse twelve days earlier;

- No one responded to the officers' repeated, loud knocks and announcement as to their presence;

- The townhouse was small and laid out in such a way that an individual inside should hear the knocks;

- Police heard noises — voices or possibly the television — inside the townhouse, and at one point an officer believed he heard a lock turning; and

- Alvarez was not at the Lorton townhouse, but thought that her sister may have been inside.

In addition to these facts, at least two permissible inferences also existed — Hill would most likely not respond to the police if he was inside the residence, and Alvarez's sister had no known reason not to answer the door.

### III.

The foregoing facts, viewed in light of the Supreme Court's instruction in *Payton*, lead me to conclude that the district court did not err in holding that the police had reason to believe Hill was inside the Lorton townhouse at the time they entered. Although there is scant Fourth Circuit precedent available, persuasive authority from other Circuit Courts of Appeals is helpful in applying the standard set forth in *Payton*.

At the outset, I note that the majority opinion wrongly articulates how courts are to assess whether the police had reason to believe the suspect was inside the residence. It states that courts within the Fourth Circuit "have sanctioned entry only where multiple facts support a reason to believe that the subject of the arrest warrant is present at the time of entry." Maj. Op. at 8. The first case referenced, *United States v. Young*, 609 F.3d 348 (4th Cir. 2010), is inapposite because the parties did not dispute that the police had reason to believe the subject of the arrest warrant was present. *Id.* at 353 ("Young does not contend . . . that the police lacked reason to believe he was inside the house."). The only issue in the case was whether a twenty-second delay between the "knock and announce" and entry was sufficient. *Id.* No reading of *Young* can sustain it as authority for the proposition stated by the majority.

The second case cited, *United States v. Morgan*, No. 92-5068, 1992 U.S. App. LEXIS 20235, at *2 (4th Cir. Aug. 24,

1992) (unpublished), is unpublished, and of course lacks pre-
cedential weight. Moreover, a case where the defendant is
observed running toward his house just before the police then
observe lights in the house turning off, hardly sets out the
outer limits of the *Payton* inquiry. *Id. Payton* does not hold,
and indeed no court applying it has ever held, that the police
must have seen the defendant nearby or have actual knowl-
edge that he is inside a residence before they can enter. *See,
e.g.*, *Gay*, 240 F.3d at 1227 ("The officers are not required to
actually view the suspect on the premises.") (citation omit-
ted); *Valdez*, 172 F.3d at 1226 ("Direct surveillance or the
actual viewing of the suspect on the premises is not
required."); *United States v. Terry*, 702 F.2d 299, 319 (2d Cir.
1983) (noting that the Second Circuit previously "rejected the
contention that the police must first conduct a thorough inves-
tigation to obtain evidence of an arrestee's actual presence
before entering his residence.").

Instead, as *Payton* and courts in other circuits have
observed, the test is a totality-of-the-circumstances analysis.
The analysis does not require a court to find a certain number
of facts, and could be based on one fact bearing sufficient
gravitas. We are not called to itemize the factors favoring and
opposing the conclusion purely to assess which side is greater
in number. Instead, as the Tenth Circuit noted in *Valdez*, we
are called to be

> sensitive to common sense factors indicating a resi-
> dent's presence. Direct surveillance or the actual
> viewing of the suspect on the premises is not
> required. Indeed, the officers may take into account
> the fact that a person involved in criminal activity
> may be attempting to conceal his whereabouts. The
> suspect's presence may be suggested by the presence
> of an automobile, the time of day, observing the
> operation of lights or other electrical devices, and the
> circumstances of a suspect's employment. And the
> officers may consider an absence of evidence the

suspect is elsewhere. No single factor is, of course, dispositive. Rather, the court must look at all of the circumstances present in the case to determine whether the officers entering the residence had a reasonable belief that the suspect resided there and would be found within.

172 F.3d at 1226 (internal quotation marks and citation omitted).

Here, as detailed above, the police had sufficient reason to believe Hill was inside the townhouse based on several pieces of information. This is not the situation identified in the majority opinion where the police "solely rel[ied] on an unidentified noise coming from within the home" as the basis for their entry. Maj. Op. at 9. The officers knew Hill would likely try to hide from them because he had fled the residence a few days before upon seeing police approach the townhouse. They had a reasonable basis on which to conclude that an individual inside the house would hear their knocks, they heard noises like voices emanating from inside the home, and Alvarez was not at home to confirm or deny Hill's presence. Similarly, as the district court found, if Alvarez's sister was present, she had no reason not to answer the door, while Hill had every reason not to do so. The police were not required to ascertain that Hill was, in fact, inside the residence; they are only required to have "reason to believe" he was there. Viewed in the totality, this record satisfies the standard set forth in *Payton*.

For the foregoing reasons, I respectfully dissent. I would affirm the district court's judgment finding that the entry satisfied the requirements of the Fourth Amendment.[3] As to the

---

[3]Since the police entry satisfied *Payton*, I do not believe it is necessary to address the district court's alternative holding that the police were justified in entering based on exigent circumstances, although I concur with the majority's analysis in section II.B. that the district court erred in that analysis.

second issue Hill raises on appeal, I concur with the majority's conclusion in section II.C. as to the validity of the consent Alavarez gave to police to search her residence. Because I conclude that the initial entry and protective sweep were constitutional, the taint issue raised by the majority is not before the court.[4] I would therefore affirm the district court's denial of Hill's motion to suppress the evidence seized from the Lorton townhouse and would affirm the judgment rendered.

---

[4]Even if a remand to consider the "taint" issue were appropriate, it is an issue never raised to, argued in, or addressed by the district court. The majority's speculation on what the district court should do on remand is thus unnecessary and speculative.